Holman FREEMAN, Petitioner-Appellant,

v.

STATE OF GEORGIA,
Respondent-Appellee.

No. 78–2871.

United States Court of Appeals,
Fifth Circuit.

July 18, 1979.

Theodore S. Worozbyt, Atlanta, Ga., for petitioner-appellant.

Lewis Slaton, Dist. Atty., H. Allen Moye, Asst. Dist. Atty., Atlanta, Ga., for respondent-appellee.

Before TUTTLE, GODBOLD and RUBIN, Circuit Judges.

TUTTLE, Circuit Judge:

This habeas appeal involves the effect of an investigating city homicide detective's concealment of a key eyewitness.

Freeman is in state custody[1] pursuant to his voluntary manslaughter conviction in the Fulton County Superior Court for shooting one Frank Saffles to death. He was indicted for two counts of murder and one count of aggravated assault. He was convicted of the murder of Ray Hill and the killing of Frank Saffles under the voluntary manslaughter statute, but was acquitted of aggravated assault on one of the eyewitnesses. He received a death sentence for the murder conviction and twenty years imprisonment for voluntary manslaughter. The trial court granted Freeman's motion for a new trial as to the murder conviction on discretionary grounds,[2] but denied the motion as to the manslaughter conviction. This denial was appealed to the Georgia Court of Appeals, which affirmed the conviction. *Freeman v. State,* 130 Ga.App. 718, 204 S.E.2d 445 (1974) (not raising the grounds urged here). Freeman then instituted a state habeas corpus application, alleging, *inter alia,* that he had been denied due process of law in violation of the 14th Amendment because the state had deprived him of a fair trial by knowingly suppressing exculpatory evidence. The state habeas court denied the writ after an evidentiary hearing and state review was exhausted when the Georgia Supreme Court refused to hear the appeal (both actions unreported). Freeman filed a § 2254 petition in federal court, which was "dismissed" by the district court based on a magistrate's recommendation to deny the petition without evidentiary hearing.

The facts present a bizarre murder-love story revolving around a mysterious Darlene McLane (a/k/a Darlene Brooks and subsequently Darlene Fitzgerald). The principal characters are these: Holman Freeman, a sometimes non-paid employee of Seymour Zimmerman, the proprietor of an Atlanta nightclub; Darlene Brooks McLane, the former wife of an alleged pimp, Paul McLane, and present wife of former Atlanta homicide detective Richard Fitzgerald; and two ex-convicts, Ray Hill and Frank Saffles.

The dime store novel scenario began when a former female employee of Zimmerman asked to return to work at his nightclub, having become disenchanted with work as a prostitute for Paul McLane. Zimmerman consented, thereby enraging McLane, who came to express his displeasure with Zimmerman face to face. To emphasize his dissatisfaction, McLane came to Zimmerman's nightclub armed. Upon entering the bar, McLane was confronted by Freeman, who, while acting as an unpaid bouncer, relieved McLane of his pistol and beat him up in the process, thereby exacer-

---

1. The fact that Freeman may have been released on parole after serving a third of his twenty year sentence does not affect § 2254 habeas jurisdiction since it is well-established that the writ may be used though the prisoner has been released on parole. *Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

2. Freeman was not retried on the murder charge and the case has been dead docketed.

bating McLane's unhappiness with Zimmerman.

Later, McLane gathered a few cronies at his apartment to hatch a plot to kill Zimmerman and Freeman by blowing up Zimmerman's nightclub. Darlene was frightened by the plan and decided to leave her husband. Needing someone to turn to, she found comfort in Ray Hill, a recently released convict, who had been Darlene's "pen pal." Darlene and Hill had been corresponding for several years during Hill's incarceration and when Hill got out of jail, he wanted to get to know his loyal pen pal. Darlene needed a friend and found protection in Hill. Hill sensed an opportunity for a quick buck and arranged a meeting with Zimmerman to warn him of McLane's plot, in hopes of receiving a "reward" for this information. Zimmerman was not buying a "pig in the poke" and had a "contact" at the Atlanta police department check out this information. Finding Hill's tip about McLane's purchasing guns and explosives to be true, Zimmerman gave Hill $500 for his help.

A short time later, Hill called the nightclub asking for more money as compensation for his life saving information. Zimmerman was unavailable so Hill spoke with Freeman, directing him to relay the message. Zimmerman concluded he would furnish only an additional $100, and asked Freeman to notify and deliver the money to Hill.

Hill refused to come to the bar to pick up the money so a meeting was arranged for the early morning hours in a parking lot in Buckhead. Darlene picked up Hill, who was accompanied by Saffles—another recently released inmate whom Hill had met in prison—to attend the rendezvous. Both men had been drinking all evening. Saffles was playing with a two shot .22 cal. derringer that he had taken from his pocket and Darlene later revealed that Hill had a .38 cal. pistol. Darlene's car arrived early and parked near the meeting place. Shortly thereafter, as found by the magistrate, the group noticed Freeman emerge from a nearby car; as he approached Darlene's car

from the passenger's side, Hill was sitting in the front passenger's seat, Saffles was behind Hill, and Darlene was at the wheel. Still, according to the magistrate, there was some small talk and Freeman reached into the car to pull a cigarette from Hill's mouth, as he was about to light the filter.

At this point in the scenario, the shooting began and the theories diverge, with Freeman contending he fired in self-defense only after Hill and Saffles unexpectedly drew their weapons and attempted to shoot him, whereas the state argued that Hill was unarmed and was shot down in cold blood, with Saffles only drawing his weapon after Freeman started shooting.

When the smoke cleared, Hill and Saffles were dead. Darlene received only a few scratches. Two pistols were found in Darlene's Cadillac—the .22 derringer and a .38. Both had been fired, with only spent cartridges remaining in the guns.

At trial, the state attempted to establish a gangland type killing, whereby Freeman and Darlene plotted with others to kill Hill and Saffles. In support of its theory, the state presented the testimony of two eyewitnesses other than Darlene. Both testified that several cars drove up to Darlene's Cadillac, Freeman emerged from one car shooting a pistol into the Cadillac from the passenger's side, and that only after the shooting started was a weaker sounding shot heard emanating from the car. One of these eyewitnesses testified that immediately after the shooting, he looked into the car and saw no pistol present near Hill but a derringer lying near Saffles. A few minutes later, the witness testified, another man approached from the driver's side and leaned into the car, and that immediately thereafter he again looked into the car and saw a pistol lying in the seat next to Hill. The prosecutor evidently considered this evidence that a confederate of Freeman's planted the .38 next to the body of Hill important, spending a significant portion of his opening and closing argument stressing that Hill was unarmed. Since the jury found only manslaughter as to Saffles but first degree murder as to Hill, it too must

have considered this evidence significant because the facts surrounding the killing of both men were the same except the jury knew Saffles was armed but had heard evidence and argument that Hill was not. Further, although these witnesses testified that Freeman fired first, the jury apparently considered one of them at least partially unworthy of belief as it acquitted Freeman on the charge of aggravated assault on the witness even though the witness testified that Freeman had tried to shoot him.

The appeal centers around the elusive Darlene and her failure to appear at Freeman's state trial. Immediately after the shooting, the police got an ambiguous statement from Darlene that could be read as consistent with both the state's theory and Freeman's defense. It was subsequently recanted in part, and significantly, did not include the testimony that Hill was armed. After being held briefly as a material witness, Darlene seemed to disappear. In the course of attempting to prepare its case, the state sought to locate Darlene and even had a material witness arrest warrant for her. Agents of the district attorney could not find her at the address furnished. Sgt. Richard Fitzgerald, a city homicide detective who investigated the shooting, was requested to help locate Darlene but consistently maintained that he did not know of her whereabouts. At the trial, he testified under oath that he did not "know exactly" where she had been during the months preceding the trial and that although the prosecutor had asked him for an address for Darlene, he had not furnished any such address. In fact, Fitzgerald had not only located Darlene but he had become her trusted confident. He had spoken with her on a monthly basis from the time of the shooting until the trial and had been to her apartment three weeks prior to trial.[3] For apparently personal reasons, Fitzgerald had helped conceal Darlene in an attempt to shield the witness from some apprehended danger involving her violence prone husband or some other spurious or illogical reason, allegedly involving politically warring factions within the Atlanta Police Department. This close relationship developed into an O'Henry ending as Darlene married Sgt. Fitzgerald one year after the trial.

The issues thus presented in this appeal are whether the actions of detective Fitzgerald in knowingly concealing Darlene amounted to the state suppressing evidence favorable to the accused, thereby depriving him of due process in violation of the 14th Amendment, and whether Freeman waived his right to object to Darlene's failure to appear by not attempting to subpoena her or moving for a continuance or mistrial when she did not appear. The state habeas court denied the writ, finding no suppression by the state of favorable evidence and in any event, that Freeman waived any objection by failing to look for Darlene. The district court simply dismissed the federal petition based on the magistrate's report.

The state attempts to justify the district court's dismissal of the petition on three grounds. First, it argues that by failing to subpoena Darlene, by failing to make a conscientious effort to find her, and by failing to seek any continuance or mistrial when she did not appear at trial—all of which were the result of calculated trial tactical decisions[4]—Freeman waived any entitlement to federal habeas relief under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Even absent a waiver, the state contends that a dismissal of the petition was proper because the evidence which Freeman alleges was "hidden" by the state was neither favorable nor material under *United States v. Agurs*, 427

---

**3.** Finding that Sgt. Fitzgerald's conduct in concealing Darlene's whereabouts amounted to state suppression of favorable evidence in violation of the 14th Amendment, we do not reach the question whether his testimony that he did not "know *exactly* where she ha[d] been" during the month preceding the trial was technically perjury, independently requiring reversal. *See, e. g. United States v. Carter*, 566 F.2d 1265 (5th Cir. 1978).

**4.** By offering no evidence, applicant was granted the closing argument during the guilt phase of the trial.

U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Finally, the state urges that the personally motivated actions of Sgt. Fitzgerald cannot be imputed to the state, so there was no "suppression" by the state and thus no *Brady* violation, even if the testimony would have been favorable and the objection was not waived. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

We reject these contentions and find Freeman's allegations sufficient to rebut the presumptive correctness of the state court's findings. We are not bound by the decision of a state court on federal constitutional questions in habeas proceedings. 28 U.S.C. § 2254(d). Our study of the record convinces us that Freeman has established a due process violation and that the contrary decision of the Georgia court cannot stand.

■ If the state deliberately conceals an eyewitness to a crime, due process has been violated and habeas must be granted if, in the context of the entire trial, the missing witness' testimony was such as might have created a reasonable doubt which would not otherwise have existed. *See United States v. Agurs,* 427 U.S. 97, 112 n. 21, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Lockett v. Blackburn,* 571 F.2d 309, 314 (5th Cir. 1978), *cert. denied* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d 186 (1979). There is no dispute, as the state habeas court specifically found, that Sgt. Fitzgerald deliberately concealed Darlene, a key eyewitness to the double-killing.[5] However, because the court found Fitzgerald's motivation to be personal, not in anyway an official attempt to prejudice

the case against the defendant, and, in any event, lacking any possible material prejudicial effect on the defendant, the court was unwilling to set aside what it considered to have been a fair trial and a just result. Additionally, the court found that the defendant's failure to subpoena or otherwise attempt to secure the attendance of Darlene constituted a waiver of any objection due to her failure to appear. We find, however, that Sgt. Fitzgerald's conduct is attributable to the state regardless of his motivation, that his admittedly willful and intentional efforts to conceal this witness prejudiced the defense, and that under the circumstances of this case, there was no waiver.

■ First, we cannot accept the state's reasoning that because Sgt. Fitzgerald's actions were personally motivated and the other state officers' conduct was proper, Fitzgerald's actions cannot be imputed to the state. We feel that when an investigating police officer willfully and intentionally conceals material information, regardless of his motivation and the otherwise proper conduct of the state attorney, the policeman's conduct must be imputed to the state as part of the prosecution team. *Smith v. Florida,* 410 F.2d 1349, 1351 (5th Cir. 1969). *Smith* relied on *Barbee v. Warden,* 331 F.2d 842 (4th Cir. 1964), where the Fourth Circuit Court of Appeals stated:

> The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. . .

---

**5.** The state habeas court found:

> The evidence at the present habeas corpus proceedings revealed that contrary to the comments made by Sgt. Fitzgerald, he was aware of where this particular witness lived and as a matter of fact during the interval between the time of indictment and the time of the trial had been to her place of residence on at least one occasion and had communicated with her on several occasions. He was aware of the precise location of the apartment and the name she was using. (Apparently during this time interval she had changed her name and was going under some other name.)
>
> The evidence in this case is clear that notwithstanding the repeated efforts of the Dis-

> trict Attorney to elicit the whereabouts of this witness from Sgt. Fitzgerald and notwithstanding the efforts of the District Attorney's Office to locate this witness, Sgt. Fitzgerald *willfully and intentionally* withheld this information.
>
> This action and conduct by Sgt. Fitzgerald in a capital case was the most reprehensible and gross act of misconduct by an investigating police officer that it has ever been the misfortune of the undersigned to be involved in. Sgt. Fitzgerald's conduct was *calculated and intentional and without any justification or excuse.*
>
> (emphasis added)

The duty to disclosure is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.

*See Schneider v. Estelle,* 552 F.2d 593 (5th Cir. 1971); *Jackson v. Wainwright,* 390 F.2d 288, 296 (5th Cir. 1968); *Curran v. State of Del.,* 259 F.2d 707, 713 (3rd Cir. 1958) (opinion below 154 F.Supp. 27); *cf. Fitzgerald v. Estelle,* 505 F.2d 1334, 1336 (5th Cir. 1975) (en banc).

Even if Sgt. Fitzgerald concealed the whereabouts of Darlene and his actions are attributable to the state, the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is violated only if *favorable* evidence is suppressed by the state. The state habeas court and the magistrate found that Darlene's testimony would not have been favorable to Freeman. Both reasoned that Freeman had available to him in substance what the testimony of Darlene would have been had she testified, in the form of her written statement taken by the police shortly after the shootings occurred. While we agree that in some respects Darlene's subsequent habeas testimony was not enlightening or favorable, both the district court and the magistrate overlooked the significance of her habeas testimony that Hill came to the meeting armed. This evidence was not included in Darlene's original statement to the police and therefore was not available in any form to Freeman at the trial.

Darlene would have testified that on the night of the shootings, Hill had in his possession the .38 revolver found beside his body, had drawn the gun while waiting for Freeman to arrive, and had placed it on the seat beside him. She also would have testified that Freeman and a single unknown companion were in the parking lot in a single car—rather than several cars with an army of assassins—and that Freeman approached the car alone, on foot, with no weapon in hand, and engaged in friendly conversation prior to the sudden eruption of gun fire. This testimony would have refuted a major prosecution argument that Hill was unarmed and would have given color to Freeman's self-defense claim. This evidence was obviously favorable to Freeman and it was clearly erroneous to hold otherwise.

Nevertheless, even if the state suppressed favorable evidence, Freeman is not entitled to habeas relief unless he was prejudiced.[6] The degree of prejudice a defendant must prove when the state suppresses favorable evidence varies according to whether the defendant specifically sought the suppressed evidence before trial. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Here, Freeman did not make any effort to locate Darlene prior to trial so unless the failure to search could be considered to be the state's fault, Freeman must prove that Darlene's testimony was such as might have created a reasonable doubt which did not otherwise exist. We feel it did.

Many key facts in this case were in dispute. The jury evidently disbelieved a substantial portion of the prosecution's evidence since it acquitted Freeman on the aggravated assault charge and convicted him only of manslaughter with respect to Saffles even though he was indicted for first degree murder as to both Hill and Saffles. As stated earlier, the facts surrounding the killing of both were the same except that the jury knew Saffles was armed but had heard evidence and argument tending to show Hill was not. Therefore, it appears that the jury considered the evidence that Hill was unarmed and that the discharged .38 was planted near his body by Freeman's confederate very important and, in this context, it seems quite possible that if the jury had heard Darlene's testimony that Hill was in fact armed, with the gun beside him, they might have been influenced to acquit Freeman on all charges.

---

6. The state habeas court purported to make a fact finding that no prejudice to Freeman occurred. The question of prejudice is a question of law, therefore, the state court finding on this point is not binding on this court.

Finally, we must consider the question of waiver. The state habeas court concluded that Freeman's failure to subpoena or attempt to secure the attendance of Darlene prior to the commencement of the trial, his failure to move for any continuance during the trial in order to secure her presence, and his failure to make use of her statement to the police constituted a waiver of any objection to her failure to appear. Due to Freeman's failure to request a continuance to subpoena Darlene or request a mistrial because of her unavailability—either of which remedies could have allowed the matter to be decided on independent state grounds—the district court, in adopting the magistrate's report, found a waiver of the claim which precluded federal habeas relief, citing *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Jiminez v. Estelle,* 557 F.2d 506 (5th Cir. 1971); *Loud v. Estelle,* 556 F.2d 1326 (5th Cir. 1977). The state argues that by failing to subpoena Darlene and relying instead upon the state to call her, Freeman waived any right to a continuance or to a mistrial; thus, his knowing failure to subpoena her operated "as a waiver of a contemporaneous objection precluding federal habeas review" under *Sykes.* We disagree.

In *Sykes,* the Supreme Court held that a defendant who fails to comply with established state procedures may thereby waive his right to complain of a constitutional violation. However, this is not a typical waiver case. The state court does not cite any specific rule of state procedure which Freeman violated; it simply concluded that in the totality of the circumstances, Freeman should have tried harder to locate Darlene. It is not even clear that the state court relied on state law to reach this conclusion, since it cites neither state nor federal authority to support its position. Further, even if the state court applied a rule of state procedure to find waiver, we are not convinced that this is the type of state procedural rule that the Supreme Court requires federal courts to defer to.

The state argues that Freeman failed to comply with Georgia's contemporaneous objection rule by failing to move for a mistrial or continuance to try to locate Darlene, and that this inaction was the result of an intelligent choice among trial tactics, thus a deliberate waiver.

We cannot fit the facts of this case so neatly into a waiver pattern. Although the decision not to introduce Darlene's police statement may have been a calculated trial decision, there is no evidence of "sandbagging" by Freeman's counsel. *Sykes* 433 U.S. at 89, 97 S.Ct. 2497. Based on Darlene's police statement—which *did not* include the exculpatory evidence—defense counsel justifiably felt that her testimony would not have been valuable as a defense witness. His intention was to cross-examine her after she was called as a state's witness. When she did not appear at trial, defense counsel said he was shocked because he felt she was the key, if not the only prosecution witness; and began efforts to locate the witness. However, it was not until Darlene revealed her whereabouts through a newspaper reporter that defense counsel was able to depose her and later discover the exculpatory evidence. There is absolutely no indication that Freeman's counsel by his trial tactics, intended to take his chance on a verdict of not guilty in the state court knowing he had an ace in the pocket with a federal constitutional claim to employ if the initial gamble did not pay off. From the record before us, it appears that the state trial would have been the "main event" rather than a "tryout on the road" for what counsel intended would later be the determinative federal habeas hearing except that the star witness was concealed by the state.

■ Even if Freeman failed to comply with state procedure within the meaning of *Francis* and *Sykes,* he has not waived his federal constitutional complaint if he can show cause for the failure to comply and prejudice as a result. The "prejudice" is self evident. Darlene's incomplete police statement and Fitzgerald's concealing her whereabouts was the "cause" for his failure

to subpoena and/or locate her. While, as the state contends, it was a matter of trial tactics that led Freeman not to subpoena Darlene or introduce her police statement because he thought it unfavorable, the state ignores the fact that this strategy was formed in reliance on Darlene's police statement, which did not contain the exculpatory evidence. When a police statement misleads the defense into believing that evidence will not be favorable, the state cannot thereafter argue that it was a waiver not to request it. A defendant cannot have waived more than what he knew existed. Freeman was not required to subpoena a witness whose report to the police contained nothing favorable to his case. Moreover, we cannot overlook the fact that even if he had tried to locate Darlene, it would have been futile because of her concealment. If the state, with all its resources, could not locate her, it is difficult to imagine how the defense counsel could have. Therefore, we find that Freeman's constitutional contention was not waived.

For these reasons, we reverse and remand the case to the district court to issue the writ unless the state elects to retry Freeman promptly.

REVERSED AND REMANDED.