Tony B. AMADEO, Petitioner-Appellee,

v.

Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellant.

No. 84–8485.

United States Court of Appeals, Eleventh Circuit.

April 30, 1987.

Rehearing and Rehearing En Banc Denied June 8, 1987.

Michael J. Bowers, Atty. Gen., Marion O. Gordon, 1st Asst. Atty. Gen., William B. Hill, Jr., Sr. Asst. Atty. Gen., Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant.

William M. Warner, Atlanta, Ga., for petitioner-appellee.

Before VANCE and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

This appeal is before this panel for the second time. The petitioner-appellee, Tony B. Amadeo, a Georgia state prisoner under sentence of death,[1] sought a writ of habeas corpus in the United States District Court for the Middle District of Georgia. The district court granted the writ, concluding (1) that the introduction of "other crimes" evidence rendered Amadeo's trial fundamentally unfair and (2) that minority groups were underrepresented on the mas- ter jury lists in Putnam County, Georgia, the location of Amadeo's trial. In the first appeal, we remanded the case for a hearing to determine whether Amadeo could establish sufficient "cause" to excuse his failure to challenge the jury lists at the trial as required by Georgia law. We reserved judgment on the "other crimes" evidence issue. *Amadeo v. Kemp*, 773 F.2d 1141 (11th Cir.1985) (per curiam). On remand, the district court conducted a hearing and determined that sufficient "cause" existed to excuse Amadeo's procedural default. The case is now back before us to resolve both issues on the merits. We find that Amadeo has not established sufficient "cause" to excuse the procedural default and that the introduction of the "other crimes" evidence did not deny him a fair trial in violation of his due process rights. Accordingly, we reverse the judgment of the district court.

I.

The district court first held that Amadeo's right to a fundamentally fair trial was violated by the admission of evidence of other crimes. This evidence established that Amadeo by his own admission made in the form of a statement to the police, had been involved in a robbery and homicide in Colbert County, Alabama on September 28, 1977, the night prior to the murder and attempted robbery in Putnam County, Georgia, which occurred at approximately 8:30 A.M. on September 29, 1977. *See* Record on Appeal, Exhibit I, Vol. II, pp. 200–02.

■ On direct appeal, the Supreme Court of Georgia approved the admission of this evidence, finding that it met the Georgia standard for the admissibility of similar crimes evidence.[2] The supreme

---

1. Amadeo was convicted of murder and attempted armed robbery in the Superior Court of Putnam County, Georgia on November 30, 1977. The pertinent factual and procedural history of this case is contained in our first opinion, *Amadeo v. Kemp*, 773 F.2d 1141, 1142 (11th Cir. 1985) (per curiam) and in the opinion of the Supreme Court of Georgia, *Amadeo v. State*, 243

Ga. 627, 255 S.E.2d 718, *cert. denied*, 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979).

2. As stated in *French v. State*, 237 Ga. 620, 621, 229 S.E.2d 410, 411 (1976), the first criterion for the admission of evidence of independent crimes is that the defendant must be shown to have been the perpetrator of the independent crime. The second requirement is that there be a sufficient connection between the independent

court also noted that the trial court instructed the jury that such evidence could be considered only to illustrate Amadeo's state of mind at the time of the Putnam County homicide and for no other reason. *Amadeo v. State*, 243 Ga. 627, 629, 255 S.E.2d 718, 720, *cert. denied*, 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). Therefore, the supreme court held that the admission of the evidence, for that limited purpose, was a recognized exception in Georgia to the general rule against the admissibility of evidence of other criminal activities.[3]

The district court found that it was unnecessary for the State to introduce this evidence to establish identity, motive or intent to rob or to rebut Amadeo's defense of an accidental shooting, and consequently ruled that the evidence was inadmissible and nothing more than prosecutorial overkill. The court reached this conclusion because at the time the state trial judge considered Amadeo's motion to exclude this evidence, the State had a written confession signed by the appellee.[4] Also, an eyewitness identified Amadeo as the person who fired the fatal shot and there was conclusive ballistics testimony.[5]

■ In our view, this is not the proper inquiry in a federal habeas corpus proceed-

ing. In considering state evidentiary objections, a federal court exercises limited review. The evidentiary error must have been "of such a magnitude as to deny fundamental fairness to the criminal trial, thus violating the due process clause." *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.),[6] *cert. denied*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976). *See also Hall v. Wainwright*, 733 F.2d 766, 770 (11th Cir.1984) (per curiam), *cert. denied*, 471 U.S. 1107, 105 S.Ct. 2344, 85 L.Ed.2d 858 (1985). In determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness, a federal court must decide whether the evidence is "material in the sense of a crucial, critical, highly significant factor." *Hills v. Henderson*, 529 F.2d at 401. *See also Osborne v. Wainwright*, 720 F.2d 1237, 1238–39 (11th Cir.1983) (per curiam).

■ We reject the district court's reasoning for several reasons. First, the Supreme Court of Georgia expressly ruled that the evidence was properly admitted under state law, a determination that is binding on this court as well as the district court. Since introduction of this evidence was relevant as a matter of Georgia law,

---

crime and the offense charged so that the proof of the former tends to prove the latter. *See also Felker v. State*, 252 Ga. 351, 359, 314 S.E.2d 621, 631, *cert. denied*, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984).

3. The Georgia Supreme Court concluded that the evidence was probative of motive, i.e., that the Alabama and Georgia crimes were committed for the same reason, to obtain money while Amadeo was AWOL from the United States Marine Corps. *Amadeo v. State*, 243 Ga. at 629, 255 S.E.2d at 720.

4. The confession recited:

Last night Gemini, Bill and I slept in my car, a 1977 Monte Carlo, in a roadside park somewhere on the other side of Atlanta. This morning, Thursday, 9/29/77, we drove around in Georgia on some back roads looking for a little store to hit. Bill was driving when we spotted an old white man in a brown pickup truck dumping trash in a dumpster. We passed by him and turned around to come back. When we got back, we turned around again and pulled up beside the truck. I got out of the back seat with a .22

automatic. I walked up to the truck and I asked him for his money. He said he didn't have none. I said yeah, you do. Then that truck [driven by Talmadge Holder], it had a white cab and steel sides, pulled up. The man was still in the back of the pickup. Then I shot him. I shot one time. The man grabbed his chest and kind of slid off the right side of the truck to the ground. He turned and yelled for help and started for that other truck. I just ran for our car. Gemini had got in the back seat so I got in the front. We took off.

Record on Appeal, Exhibit I, Vol. II, p. 225.

5. However, counsel for Amadeo maintained in opening and closing argument that the confession was involuntary and that the shooting was accidental. While no evidence was introduced by the defense on this issue, the potential for such defenses remained at the time of the admission of the "other crimes" evidence.

6. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

we cannot say that its admission denied Amadeo fundamental fairness under these circumstances. *See Jameson v. Wainwright,* 719 F.2d 1125, 1127 (11th Cir.1983) (per curiam), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2355, 80 L.Ed.2d 827 (1984).

Even if this evidence was admitted in violation of Georgia law, there was still no violation of due process. The overwhelming weight of the evidence of Amadeo's guilt of the Georgia murder defeats his argument that evidence of the Alabama crimes constituted a "crucial, critical, highly significant factor" in the case against him.

In any event, the overwhelming nature of the other evidence establishing Amadeo's guilt would render any constitutional error harmless beyond a reasonable doubt. *See Rose v. Clark,* —— U.S. ——, ——, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986):

> The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'

*See also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## II.

The district court also predicated its grant of the writ on its finding that the 1977 master jury lists in Putnam County underrepresented women and blacks, depriving Amadeo of his equal protection rights. Amadeo did not attack the composition of the jury lists at the trial; he first raised the issue on direct appeal to the Supreme Court of Georgia. That court refused to address this assignment of error because of Amadeo's failure to complain of this possible infirmity at the time of trial. The district court excused this procedural default, finding that Amadeo was prevented from making out a prima facie case of

jury discrimination by the conduct of Putnam County officials. Before reaching the merits of the jury composition issue, we must first examine Amadeo's failure to challenge these jury lists during his state court trial and the district court's conclusion that cause existed to forgo this challenge.

■ A federal habeas corpus court will not consider an issue if the petitioner did not pursue that issue in the state court and thereby committed a procedural default, unless he can overcome this bar by showing cause for and actual prejudice from the default. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). Georgia law clearly requires a criminal defendant to make a timely jury challenge at the trial. *See* O.C. G.A. §§ 15–12–162, 9–14–42(b). It is also undisputed that Amadeo failed to make such a timely challenge and that this failure constituted a procedural default under Georgia law. *Amadeo v. State,* 243 Ga. at 629–30, 255 S.E.2d at 720. Consequently, our inquiry turns to whether Amadeo can overcome this procedural bar by demonstrating sufficient "cause" and "actual prejudice."

Because federal courts must analyze "cause" under a wide variety of circumstances, no court has yet accorded that term a precise definition. Rather, guidance is provided by the policy rationale for the "cause" requirement. The avowed purpose of this requirement is to preserve the integrity of state judicial procedures and to bind a defendant to the tactical decisions of competent counsel, absent a miscarriage of justice. *Reed v. Ross,* 468 U.S. 1, 13, 104 S.Ct. 2901, 2909, 82 L.Ed.2d 1, 13 (1984); *Smith v. Kemp,* 715 F.2d 1459, 1470 (11th Cir.), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 518, 78 L.Ed.2d 699 (1983).

> In general, therefore, defense counsel may not make a tactical decision to forgo a procedural opportunity—for instance, an opportunity to object at trial or to raise an issue on appeal—and then, when

he discovers that the tactic has been unsuccessful, pursue an alternative strategy in federal court.

. . . .

On the other hand, the cause requirement may be satisfied under certain circumstances when a procedural failure is not attributable to an intentional decision by counsel made in pursuit of his client's interests. And the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the requirement is met.

*Reed v. Ross,* 468 U.S. at 14, 104 S.Ct. at 2909, 82 L.Ed.2d at 13–14.

The Supreme Court furnished further instruction on this point in a recent decision:

[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel ... or that 'some interference by officials' ... made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier,* —— U.S. ——, —— – ——, 106 S.Ct. 2678, 91 L.Ed.2d 427 (1986).

We remanded this case to the district court to make the inquiry outlined in *Reed.* "To fulfill the causation prong ... it is necessary for petitioner to establish that the defects in the jury composition were not reasonably discoverable by his counsel and that the decision not to challenge the composition was not a deliberate bypass." *Amadeo v. Kemp,* 773 F.2d at 1145. That hearing established the sequence of events relating to Amadeo's failure to challenge the jury lists.

Amadeo's trial counsel, William A. Prior and E.R. Lambert, testified that they considered making a challenge to the grand and petit juries and were aware that minorities were probably underrepresented in the Putnam County master jury lists. Record on Appeal, 2d Supp., pp. 8, 11–13, 20. However, after reviewing the petit jury venire with a local attorney, they elected not to pursue the challenge for various tactical reasons.

First, they were satisfied with the representation of blacks on the venire, which was approximately fifty percent. *Id.* at 10. One attorney stated that he would be reluctant to try the case with any more blacks on the venire because the State possessed evidence that Amadeo, a white male, had assaulted a number of blacks in Alabama and Mississippi. The lawyer feared that a jury heavily weighted with black jurors might become prejudiced against Amadeo if the State introduced this evidence at the trial. *Id.* at 12. Second, the attorneys were satisfied with the existing venire because it contained several members of a charismatic religious group that had shown some sympathy for the welfare of local prisoners. *Id.* at 13. Such individuals were viewed as less likely to impose the death penalty. *Id.* at 30. Counsel also were aware that these advantages might be lost if the venire was challenged and the master list was reconstituted. *Id.* at 9.

Amadeo's lawyers confirmed their decision to waive a jury challenge when the actual jury selected for Amadeo's case contained an even number of blacks and whites and a majority of women. *Id.* at 12, 35–36. As such, they made no challenge to either the grand or petit juries and did not make an effort to examine the master jury lists. As one lawyer testified, "it was a tactical decision on our part not to challenge the array because of the fact that we had gone over the list with [a local attorney]; we felt like we had about as good a Jury List as we could get. . . . we made a tactical decision, a knowing, tactical decision not to challenge the array." *Id.* at 12–13.

After Amadeo was convicted and sentenced to death, and while his direct appeal was pending before the Supreme Court of Georgia, Christopher Coates, counsel in an unrelated civil suit, *Bailey v. Vining,* Civ. Action No. 76–199–MAC (M.D.Ga. Aug. 15–

17, 1978),[7] discovered a 1977 memorandum from the county prosecutor advising the jury commissioners to add specified numbers of blacks to the lists. The memorandum was filed in the book containing the master jury lists and was available to anyone examining those lists. Record on Appeal, 2d Supp., pp. 41–42, 49–50. The district court characterized this memorandum as an effort to protect the jury lists from constitutional scrutiny by placing the names of enough blacks on the lists to preclude a prima facie case of jury discrimination, but still maintain as much racial disparity as possible.[8] Coates advised Amadeo's counsel of this memorandum and they amended their appeal to include a challenge to the composition of the jury. As stated earlier, the Georgia Supreme Court declined to reach this issue because of the procedural default. *Amadeo v. State*, 243 Ga. at 629–30, 255 S.E.2d at 720.

The district court found "cause" to excuse the procedural default because the county's efforts to maintain yet conceal racial disparity on the jury lists prevented Amadeo's counsel from discovering the facts that could lead to a jury challenge. Once the memorandum was discovered by counsel in *Bailey v. Vining* and related to Amadeo's lawyers, they acted promptly to raise the jury issue on direct appeal. In the view of the district court, this "concealment" excused the procedural default.[9]

■ We disagree with that conclusion. The memorandum detailing the county's efforts to alter the racial composition of the master jury lists was not concealed from Amadeo's counsel, but was readily discoverable in the county's public records. Had counsel elected to examine the jury lists, they would have found the memorandum. However, they made a considered tactical decision not to mount a jury challenge because they wanted to preserve an advantageous jury venire. As such, they did not review the jury lists and thereby did not become aware of the memorandum until its discovery during the *Bailey v. Vining* voting rights case. These facts, in our opinion, do not establish sufficient "cause" to excuse Amadeo's procedural default.

Our decision finds support in a 1984 decision of this court. In *Birt v. Montgomery*, 725 F.2d 587 (11th Cir.) (en banc), *cert. denied*, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984), a Georgia state prisoner maintained that his trial counsel's failure to question the racial composition of the jury was unreasonable and thereby constituted "cause" excusing the procedural default as well as ineffective assistance of counsel. In that case, as here, the lawyer considered a jury challenge and made a preliminary inquiry into the composition of the jury. *Id.* at 598. He decided to abandon the challenge, again for tactical reasons. In the opinion of the attorney, the racial mix of the jury venire and the actual jury empaneled to try the case was advantageous to the defendant and this advantage might be lost in a jury drawn from a revised list. *Id.* at 598–99. We found

---

7. *Bailey v. Vining* was a voting rights action challenging the at-large election system used in Putnam County.

8. Courts have indicated that a ten percent or smaller disparity between the proportion of a minority group in the relevant local population and its representation on jury lists is acceptable under the Constitution. Larger disparities may justify finding an equal protection violation. *See Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S.Ct. 824, 829, 13 L.Ed.2d 759, 766 (1965); *Bowen v. Kemp*, 769 F.2d 672, 684–86 (11th Cir. 1985); *Preston v. Mandeville*, 428 F.2d 1392, 1393–95 (5th Cir.1970). *See generally Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498, 510–11 (1977) (elements of a prima facie case of jury discrimination).

After the Putnam County jury commissioners complied with the prosecutor's suggestion, the grand jury list underrepresented blacks by 10.7% and the petit jury list underrepresented blacks by 5.1%. *See* Record on Appeal, Petitioner's Exhibit 4.

9. In their testimony before the district court after remand, Amadeo's attorneys stated that had they known of the memorandum and the racial disparity created by it, they would have launched an attack on the racial composition of the jury. *See* Record on Appeal, 2d Supp., pp. 25–27, 46, 58–59, 62. These statements made after the conviction and sentence are in direct conflict with their earlier testimony that they suspected racial disparity in the list but made a conscious election to forgo a challenge because of the favorable jury array.

counsel's tactical decision was reasonable under the circumstances and denied the writ. *Id.* at 600–01. *See also Straight v. Wainwright,* 772 F.2d 674, 677–78 (11th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986). The present case calls for a similar result.[10]

In summary, we hold that introduction of "other crimes" evidence by the prosecution did not deny Amadeo a fair trial and that he has not established sufficient "cause" to overcome his procedural default in failing to object to the composition of the master jury lists. Accordingly, the district court erred in granting the writ of habeas corpus.[11]

The judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.

CLARK, Circuit Judge, dissenting:

This case involves a scheme by the county solicitor's office and the county jury commission to limit the number of blacks on grand and petit jury lists in Putnam County, Georgia. The scheme included a coverup intended to mask the impropriety by keeping the percentage of black jurors within statistical guidelines mentioned in the prevailing case law. The majority holds that a defendant who did not learn of the underlying scheme until after his trial is barred from raising that claim in federal court because of procedural default. Such a result rewards the state for its underhandedness and stretches the doctrine of *Wainwright v. Sykes* beyond recognition. Accordingly, I dissent.

## I. FACTS

We remanded this case to the district court for a hearing to determine whether "the defects in the jury composition were ... reasonably discoverable by [Amadeo's] counsel and [whether] the decision not to challenge the composition was ... a deliberate bypass." *Amadeo v. Kemp,* 773 F.2d 1141, 1145 (11th Cir.1985). After holding such a hearing, the district court found that petitioner had demonstrated sufficient "cause" for his failure to object at trial to the composition of the master jury list. Although the majority does not explicitly state the standard of review employed in this case, I assume the factual findings underlying the district court's legal ruling are accepted as true unless they are clearly erroneous.

At the evidentiary hearing, the state conceded that the county intentionally discriminated against blacks in the selection of prospective jurors and that the prejudice prong of *Wainwright v. Sykes* was established. 2d Supp. Record, Vol. I at 67. The undisputed evidence of this discrimination was first presented in *Bailey v. Vining,* No. CIV 76–199–MAC (M.D.Ga. Aug. 17, 1978). In *Bailey,* a civil case, plaintiffs challenged Putnam County's voter registration and juror selection procedures. Judge Owens, the district judge in the instant case, was also the judge in *Bailey.* As a result of *Bailey,* the county was required to revise its juror selection procedures. The following version of the pre–1978 jury selection procedures in Putnam County is uncontroverted.

### 1. *The Discriminatory Scheme.*

Prior to Amadeo's indictment, the Putnam County Solicitor's (now the District Attorney's) Office advised the county jury commission to recompile the grand and petit jury lists in a manner that would under-

---

**10.** Since we conclude that Amadeo has failed to establish "cause" for his procedural default, we do not address the issue of "actual prejudice" or reach the merits of his jury challenge.

**11.** Amadeo raised eight issues in his federal petition for habeas corpus. He claims that the jury lists were unconstitutional, that the admission of the "other crimes" evidence denied him a fair trial, that his confession was involuntary, that trial counsel was ineffective, that the trial

court gave improper jury instructions on armed robbery, mitigating circumstances and the jury's right to recommend a life sentence, and that the Supreme Court of Georgia failed to properly evaluate the proportionality of his death sentence. The district court considered only the first two issues when it granted the writ. The failure to address the six remaining issues requires a remand for the resolution of these questions.

represent blacks by a percentage just small enough to avoid challenges based solely on statistical evidence. Specifically, a memorandum from the prosecutor's office advised the commission to place the names of 101 blacks in the grand jury pool and 298 blacks in the petit jury pool. Petitioner's Exhibit 4.[1] Such racial precision was possible because the master jury list was drawn from voter registration cards which were kept in two separate groups, one for blacks and one for whites. The memorandum indicated that the percentage of blacks in the eligible population was 42.1%, and that the selection of 101 blacks for the grand jury list would raise the percentage of blacks on that list to 31.4%. In addition, blacks would constitute 37% of those on the petit jury list. The disparity between the percentage of blacks in the grand and petit jury pools and the percentage of blacks in the population would be 10.7% and 5.1%, respectively.

### 2. *The Coverup.*

The size of this disparity was sufficiently small to prevent a challenger of the jury lists from establishing a prima facie case of racial discrimination. *Compare Swain v. Alabama,* 380 U.S. 202, 208–09, 85 S.Ct. 824, 829, 13 L.Ed.2d 759, 767 (1964) (10% underrepresentation not enough to establish prima facie case) with *Preston v. Mandeville,* 428 F.2d 1392, 1393–94 (5th Cir.1970) (14.3% underrepresentation sufficient to establish prima facie case). The district court, relying in part on its work in a prior civil case against Putnam County, found that the district attorney's office memorandum suggested the 10.7% and 5% disparities in order to prevent defendants

from establishing prima facie cases of discrimination. Record, Vol. I at 147.

The jury commissioners followed the advice in the prosecutor's memorandum. Thus, the pre–1978 jury lists in Putnam County were compiled according to racial quotas which are clearly unconstitutional. *See, e.g., Cassell v. Texas,* 339 U.S. 282, 290, 70 S.Ct. 629, 633, 94 L.Ed. 839, 849 (1950).[2] More importantly for purposes of this case, the discriminatory scheme was designed to make detection by defendants nearly impossible. The jury pools appeared to be fairly integrated. Even if a challenge was made in any particular case, it was almost sure to fail because of a lack of proof. Only a defendant possessing direct evidence of intentional discrimination could hope to mount a successful challenge to the grand or petit jury.

### 3. *The "Smoking Gun."*

The testimony at the evidentiary hearing showed that Amadeo's attorneys did not know of the intentional discrimination by the jury commissioners until several months after Amadeo's trial. In early 1978, Amadeo's counsel was contacted by Christopher Coates, an attorney for the plaintiffs in a voting rights case against Putnam County. As part of his background research in the voting rights case, Coates surveyed "all the jury materials for a 20 to 30 year period." 2d Supp. Record at 42. Coates found the "smoking gun" memorandum from the district attorney's office somewhere in the middle of the mass of documents he obtained from the county clerk. 2d Supp. Record at 50.

Amadeo's counsel immediately incorporated the jury discrimination issue into his

---

**1.** The memorandum also suggested limiting the number of women and people under age 25 on the master jury lists.

**2.** Although Amadeo is white and blacks were unconstitutionally excluded from the jury array, he nonetheless has standing to raise his challenge here; for, "whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law." *Peters v. Kiff,* 407 U.S. 493, 504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83

(1972). *See Duren v. Missouri,* 439 U.S. 357, 359 n. 1, 99 S.Ct. 664, 661 n. 1, 58 L.Ed.2d 579 (1979) ("A criminal defendant has standing to challenge exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class."); *Taylor v. Louisiana,* 419 U.S. 522, 526, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975) (male defendant had standing to raise "the claim that the exclusion of women from jury service deprived him of the kind of factfinder [sic] to which he was constitutionally entitled").

appeal to the Georgia Supreme Court. That court refused to entertain the claim because it had not been raised at trial. *See Amadeo v. State*, 243 Ga. 627, 255 S.E.2d 718 (1979), *cert. denied*, 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). The district court, after hearing testimony from counsel, held that this issue was not barred from federal review because Amadeo had demonstrated cause for his failure to object at trial. The majority's reversal of that decision ignores the policies underlying *Wainwright v. Sykes*, and ignores the fact-finding role of the district court.

## II. ANALYSIS

*Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), announced the rule that federal habeas courts may not entertain procedurally defaulted grand jury challenges by state prisoners absent a showing of "cause" and "actual prejudice." The decision brought the law regarding procedural defaults by state prisoners into line with the law regarding procedural defaults by federal prisoners. *See Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). Federalism concerns required giving at least as much deference to state procedural rules as is given to the corresponding federal rules in federal courts. *Francis*, 425 U.S. at 541–42, 96 S.Ct. at 1711.

In *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Court extended the *Francis* "cause" and "prejudice" test to a case involving a failure to contemporaneously object to an error at trial. *Sykes* reiterated the federalism concerns of *Francis*, and gave several examples of how failure to honor the state's contemporaneous objection rules would be an affront to principles of comity. First, it might "encourage 'sandbagging' on the part of defense lawyers, who may take their chances of a verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off." *Id.* at 89, 97 S.Ct. at 2508. Second, it might "detract from the perception of the trial of a criminal case in state court

as a decisive and portentous event." *Id.* at 90, 97 S.Ct. at 2508.

These comity based concerns need to be balanced against the role of the federal habeas court as a tribunal of last resort for state prisoners. Thus, the "cause" and "prejudice" test is designed to ensure the adjudication of federal claims in federal court where the failure to do so would result in a miscarriage of justice. *Id.* at 90–91, 97 S.Ct. at 2508. Consistent with this goal, "this court has ... attempted to secure defendants who have not strategically withheld constitutional objections in state court from the possibility of injustice." *Huffman v. Wainwright*, 651 F.2d 347, 351 (5th Cir. Unit B July 1981).

As the majority indicates, any attempt to define cause must take into consideration the federalism principles identified in *Sykes* as well as the overriding duty of the federal habeas court to avoid manifest injustice. *Ante* at 1505. On the facts of this case, both of these factors lead me to the conclusion that Amadeo has demonstrated cause for his failure to raise his jury challenge at the trial level.

The most important comity concerns discussed in *Sykes* simply are not involved in this case. The district court found that Amadeo's counsel did not "deliberately bypass" the state trial court. 1st Supp. Record, Tab 16 at 5. There is no evidence of "sandbagging." At the time of trial, counsel had no reasonable basis for challenging the master jury lists. Since the "smoking gun" memorandum was discovered after trial by a different attorney in an unrelated case, there is no indication that Amadeo was holding back his federal habeas "trump card" hoping for a favorable verdict. In fact, the district court specifically found that Amadeo's counsel *would* have raised the jury claim at trial if they had known about the solicitor's memorandum. Based on counsel's testimony at the evidentiary hearing, this factual finding is not clearly erroneous.

The majority suggests, *ante* at 1506–1507, that Amadeo's counsel (William Prior and Roy Lambert) considered an objection to the jury array but decided, as a matter

of tactics, to proceed with the jury that was picked. This argument misses the mark for several reasons. First, the claim which counsel considered at trial was a challenge to the composition of the jury array based on *statistical underrepresentation.* One can hardly fault Amadeo's attorneys for rejecting such a challenge, since the racial composition of the array did not suggest a sufficient underrepresentation of blacks to warrant much concern. Indeed, the unconstitutional jury selection process had been specifically designed to withstand challenges based on statistical evidence. Under these circumstances, counsel's pretrial discussions regarding a possible statistical challenge should not preclude Amadeo from raising a claim based on (newly discovered) direct evidence of intentional discrimination in the juror selection process.

Second, a challenge to the jury array is not the same as a challenge to the master jury list. At the evidentiary hearing, Amadeo's counsel noted that the actual array chosen for Amadeo's trial appeared to be fairly integrated. What counsel could not see by looking at the array was that the array was chosen from a master list which was specifically designed to underrepresent blacks. The infection of the selection system at the master list level is not cured by the random selection of arrays from that master list. Once the master list is affected by discriminatory selection procedures, the juries chosen from that list are tainted. It is nearly impossible to predict what type of jury would have been selected if the master list had been compiled in a constitutional manner. Nor is it certain how such a jury would have decided this case. For these reasons, the Supreme Court has indicated that, where the jury has been chosen according to racially discriminatory procedures, prejudice to the defendant is presumed. *See Peters v. Kiff,* 407 U.S. 493, 504–05, 92 S.Ct. 2163, 2169, 30 L.Ed.2d 83 (1972); *cf. Rose v. Mitchell,* 443 U.S. 545, 550–59, 99 S.Ct. 2993, 2997–3002, 61 L.Ed.2d 739 (1979) (discrimination in selection of grand jury not rendered harmless by subsequent conviction by petit jury).

Third, the majority ignores important factual findings made by the district court. After hearing testimony from Amadeo's counsel, the court found that the pressures of being a lawyer in a small rural community served as an effective deterrent against raising claims of jury discrimination. Such claims would necessarily impugn the integrity of county officials, and would jeopardize the lawyer's standing in the community. 1st Supp. Record, Tab 16 at 2. Notwithstanding these community pressures, the court concluded "that if [counsel] had known of the memorandum that in spite of the local hesitancy on the part of lawyers to challenge the box, that they, nevertheless, would have had backbone enough to do so." *Id.* at 4. This finding clearly indicates that counsel did not make a strategic decision to hold back the jury claim in the hopes of obtaining a favorable verdict at trial.

A second comity concern stressed in *Sykes* is the desire to ensure that the trial remains the "main event" in the criminal process. This concern is most important where a defendant deliberately bypasses the opportunity to raise an available claim at trial. It is even relevant where counsel's failure to raise the issue was the result of negligence. *See Murray v. Carrier,* —— U.S. ——, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (attorney "inadvertence" or "ignorance" does not constitute cause under *Sykes*). By refusing to entertain claims "negligently" bypassed, federal courts provide an incentive to the bar to exercise the utmost care in recognizing and raising meritorious claims at trial.

The above concern is irrelevant, however, where neither the defendant nor his counsel were at fault for the procedural default. *See Reed v. Ross,* 468 U.S. 1, 14–16, 104 S.Ct. 2901, 2909–10, 82 L.Ed.2d 1 (1984).[3]

---

**3.** For this reason, the majority's reliance on *Birt v. Montgomery,* 725 F.2d 587 (11th Cir.) (en banc), *cert. denied,* 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984), is misplaced. In *Birt,* the only asserted "cause" for failing to raise the jury claim was that counsel rendered ineffective assistance. We *rejected* the ineffectiveness claim and thus found there was no "cause for the defendant's failure to object at trial. *Id.* at 596–601. In the instant case, Amadeo does not al-

The majority suggests counsel was "at fault" because the "smoking gun" memorandum which set forth the county's plan to rig the jury lists was "readily discoverable in the county's public records." *Ante* at 1507. Further, the majority speculates that "[h]ad counsel elected to examine the jury lists, they would have found the memorandum." *Id.*

The majority's "factual findings" are troubling for several reasons. First, there simply is no factual support in the record for the proposition that the memorandum was "readily discoverable" or that Amadeo's counsel "would have found the memorandum" if they had looked. Christopher Coates, the attorney who found the memorandum, testified that he was conducting a broad investigation as to whether blacks historically had been underrepresented in Putnam County. As part of his research, he set out to survey all of the jury materials for a twenty to thirty-year period. Although he did not recall precisely where he found the incriminatory memorandum, he remembered that "it was not on the first page of the materials I was perusing, but somewhere in the stack of materials that [the county clerk] gave me ... it wasn't on top. I found it because I was going through all the materials." 2d Supp. Record at 41, 50. This testimony belies the majority's assertion that the document was "readily available." Furthermore, it is not at all clear that a search by counsel would have led them to this document. The majority does not suggest counsel should have reviewed twenty years worth of documents as part of their pretrial preparation in this case. It is at least as reasonable to assume counsel would have reviewed only the current jury lists. Since the memorandum was found in the middle of a stack of older documents, I find the majority's factual inferences to be unreasonable.

Moreover, even if there had been no obfuscatory behavior by county officials, it is unreasonable to expect counsel to conduct a detailed search of the county court records. By its holding, the majority deprives petitioner of a forum for his claim because his attorneys, who were facing the usual rigors of pretrial preparation in a capital case, did not find the time to scour the public records in search of evidence of intentional discrimination. Such a ruling ignores the realities of capital defense work and, more importantly, is not necessary to ensure that the trial is the "main event" in the criminal process. Absent some reason to suspect jury tampering (such as statistical evidence of underrepresentation), defense counsel would almost never be able to afford the luxury of examining all "publicly available" documents for favorable evidence. This realization is the basis for the holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (requiring prosecutorial disclosure of evidence favorable to defendant). Defense counsel must be able to rely on the candor of the prosecutor's office. Where the prosecutor's office is a party to the scheme to underrepresent blacks on jury lists, it is particularly unreasonable to expect defense counsel to uncover such malfeasance.

In this respect, this case is analogous to *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). In *Reed*, the Court held that "where a constitutional claim is so novel that its *legal* basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." *Id.* at 16, 104 S.Ct. at 2910 (emphasis added). In the instant case, the *factual* basis of Amadeo's constitutional claim was not reasonably available to counsel. In such a case, as in *Reed*, "it is safe to assume that [counsel] is sufficiently unaware of the [constitutional] question's latent existence that we cannot attribute to him strategic

lege his attorneys were ineffective for failing to raise the jury claim. Amadeo claims counsel could not have raised the claim at trial because the evidence of intentional discrimination was not discovered until after trial. Furthermore, he argues his attorneys lacked sufficient evidence to challenge the jury on the basis of statistical underrepresentation. The allegations of state misconduct in concealing the constitutional violation are sufficient to distinguish this case from *Birt*.

motives of any sort." *Id.* at 15, 104 S.Ct. at 2909–10.

Finally, I cannot ignore the fact that the county did its best to conceal this constitutional violation. The discriminatory scheme was carefully designed to achieve the maximum underrepresentation of blacks without allowing criminal defendants to use the statistical disparity to establish prima facie cases of jury discrimination. The only direct evidence of this scheme was buried somewhere in a stack of documents in the county clerk's office. Under the circumstances, certainly it is no coincidence that this evidence was discovered by an attorney conducting discovery in a civil case. Without the benefit of a prima facie case, criminal defendants and their counsel are unlikely to undertake massive investigations to uncover direct evidence of intentional discrimination.

The fact that the jury issue did not surface at trial is largely attributable to the intentional concealment by the county. Recent decisions by the Supreme Court and by our court provide support for the proposition that such misconduct by the state can constitute "cause" for failure to raise an issue at trial. In *Murray v. Carrier,* — U.S. ——, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), the Court noted that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Id.* at ——, 106 S.Ct. at 2646. We have applied this language to excuse default under circumstances significantly less compelling than those in the present case. In *Dorman v. Wainwright,* 798 F.2d 1358 (11th Cir.1986), the defendant dismissed his direct appeal in state court because he had not received a transcript of his trial. Under state law, the defendant's voluntary dismissal of his appeal barred him from further review of alleged trial errors. However, since it was the state's responsibility to furnish the transcript, we found it unnecessary to apply the state's procedural default rule in federal court:

> The state's failure to provide Dorman with a trial transcript within a reasonable time to perfect his appeal constitutes an external factor out of Dorman's control that suffices as "cause" for the dismissal of the direct appeal.

*Id.* at 1370. It is inconceivable to me that the state misconduct in the present case would not constitute "cause" while the failure to provide a transcript would suffice to make such a showing. *Cf. Freeman v. Georgia,* 599 F.2d 65, 71–72 (5th Cir.1979) (where defense counsel was misled to believe missing witness would be unfavorable, defendant could not be held responsible for counsel's failure to make attempts to locate that witness), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980); *Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 845 (4th Cir.1964) (where defense counsel was misled into thinking ballistics test results supported state's theory, counsel's failure to make a specific request for the test results was excused).

The misconduct in this case is particularly egregious because the county prosecutor's office initiated the discriminatory scheme. The prosecutor's knowledge of the prevailing standards for establishing a prima facie case of jury discrimination was the key to the effective concealment of the discriminatory scheme. The prosecutor's office is under a special duty to be candid in criminal cases and I would hope that this duty would be scrupulously honored where the defendant's life is at stake. The thought of one arm of the prosecutor's office suggesting methods to shield unconstitutional jury selection processes while another arm of the prosecutor's office argues to this court that defense counsel should have searched the public records for evidence of the scheme is unconscionable.

In sum, comity concerns do not require that we reward the state for its own misconduct. In fact, the interests of justice mandate that we consider the merits of Amadeo's claim. Where the state's efforts to conceal its misconduct cause an issue to be ignored at trial, the state should not be allowed to rely on its procedural default rules to preclude federal habeas review. *See Freeman, supra.* Such a result is not

required by *Sykes*, nor is it permitted under our prior cases.

Because I believe Amadeo has shown "cause" for his failure to raise the jury issue at trial, and because the existence of "prejudice" is uncontested, I would affirm the district court's order granting the writ in this case.