DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Defendant-appellant, Audrey Iacona, appeals the judgment of the Medina County Court of Common Pleas that convicted her of involuntary manslaughter, child endangering, and abuse of a corpse. We affirm in part and reverse in part.
On May 1, 1997, Defendant gave birth to a baby boy in the basement of her parents' Granger Township home. The baby weighed approximately five pounds and measured fourteen inches in length. His gestational age was approximately thirty-two weeks. After giving birth, Defendant phoned Lynn Scherma, a high school friend, and informed her that the baby was in the basement and that he was dead. Ms. Scherma in turn contacted her father, who placed a 911 call.
Patrolman Patrick Domos of the Hinkley Township Police Department arrived at the Iacona residence in response to the 911 call. He was joined at the scene by deputies and detectives from the Medina County Sheriff's Department. In the basement, officers identified what appeared to be two fresh bloodstains on the carpeting near a weight bench. Later, officers located bloodstained clothing in an upstairs bathroom and a pair of scissors with an apparent bloodstain in the basement. Detective Tadd Davis, who photographed the scene, identified numerous small drops of blood in a basement utility room. Detective Davis also discovered in that room the body of the baby wrapped in a towel and placed in a white garbage bag, which, in turn, was covered with a blanket and placed in a second garbage bag. The top edges of the outer bag were tucked closed.
On June 19, 1997, the State filed a complaint alleging that Defendant was a delinquent child by virtue of committing murder or, in the alternative, involuntary manslaughter. The State moved for a mandatory transfer of jurisdiction over Defendant to the court of common pleas pursuant to R.C. 2151.26(B)(3)(a). After conducting a hearing, the juvenile court determined that there was probable cause to believe Defendant had committed murder. The juvenile court relinquished jurisdiction over Defendant on June 27, 1997.
On September 26, 1997, a grand jury indicted Defendant on one charge of murder, a felony of the first degree, in violation of R.C. 2903.02; two charges of involuntary manslaughter, felonies of the first degree, in violation of R.C. 2903.04(A); two charges of endangering children, felonies of the third degree, in violation of R.C. 2919.22(A), (B)(1), and (E)(2)(c); and one charge of abuse of a corpse, a felony of the fifth degree, in violation of R.C.2927.01(B). On November 4, 1997, Defendant moved to suppress all evidence obtained as a result of the search of her parents' home. The trial court denied the motion on December 4, 1997, concluding that Defendant's parents knowingly and voluntarily consented to the search.
Trial to a jury commenced on January 31, 1998. During presentation of Defendant's case, the State attempted to impeach the testimony of a defense expert by producing results of a blood culture conducted during the autopsy of the baby ("Exhibit 77"). Defense counsel informed the trial court that they were not aware of the existence of the culture. Defendant requested a mistrial on that basis, which the trial court denied. Defendant moved to admit Exhibit 77 with a proffer, and the trial court excluded the exhibit.
On February 18, 1998, Defendant was convicted of each count of involuntary manslaughter and child endangering and of abuse of a corpse. The jury was unable to reach a verdict on the murder charge. The trial court sentenced Defendant to concurrent sentences of eight years on each count of involuntary manslaughter, three years on each count of child endangering, and six months for abuse of a corpse. Defendant moved for a new trial pursuant to Crim.R. 33(A)(1), (2), and (6) on October 13, 1998. The trial judge recused himself following sentencing and a visiting judge was assigned. On June 30, 1999, following a lengthy hearing, the court denied Defendant's motion for a new trial.
This appeal followed. Defendant has advanced seven assignments of error in support of this appeal. We will address each in turn.
ASSIGNMENT OF ERROR I
 [Defendant] was improperly subjected to mandatory bindover and deprived of her right to an amenability hearing under R.C. 2151.26 and Juv.R. 30. [Defendant] did not receive a proper bindover hearing because (a) the state failed to produce a critical blood culture report and presented false testimony at that hearing, and (b) in any event, the evidence adduced failed to establish probable cause to believe that a mandatory bindover offense was committed.
In her first assignment of error, Defendant has argued that prosecutorial misconduct during the bindover proceedings deprived her of her right to due process of law. She has also maintained that the evidence presented at the hearing was insufficient to establish probable cause and, therefore, that bindover was improper. Defendant's arguments will be addressed in reverse order.
The juvenile court retains exclusive jurisdiction over any person who is accused of committing a crime while under the age of eighteen unless jurisdiction is transferred pursuant to R.C.2151.26. R.C. 2151.26(E); State v. Golphin (1998), 81 Ohio St.3d 543,544-45. This exclusive jurisdiction cannot be waived. Statev. Wilson (1995), 73 Ohio St.3d 40, paragraph two of the syllabus. Except as specified in R.C. 2151.26(B), transfer of jurisdiction is discretionary. See R.C. 2151.26(C)(1). In any case in which the juvenile court may transfer jurisdiction over an alleged delinquent child, a preliminary hearing must be conducted to determine whether "there is probable cause to believe that the child committed the act alleged and that the act alleged would be a felony if committed by an adult." Juv.R. 30(A).[1] In that situation, the juvenile court may transfer the case for prosecution upon determining that the child was fourteen years of age or older at the time of the offense, that there is probable cause to believe the child committed the act alleged, and that:
 The child is not amenable to care or rehabilitation or further care or rehabilitation in any facility designed for the care, supervision, and rehabilitation of delinquent children; [and]
 The safety of the community may require that the child be placed under legal restraint, including, if necessary, for the period extending beyond the child's majority.
R.C. 2151.26(C)(1).
In contrast, R.C. 2151.26(B) specifies four situations in which bindover is mandatory. Juv.R. 30 does not require a determination of amenability to rehabilitation as a prerequisite to transfer when bindover is mandatory. In re Langston (1997),119 Ohio App.3d 1, 4; State v. Gamble (Mar. 11, 1998), Lorain App. No. 97CA006764, unreported, at 4-5. Pursuant to R.C.2151.26(B)(3)(a), transfer of jurisdiction is mandatory upon a finding by the juvenile court that there is probable cause to believe that a child committed a category one offense and that the child was sixteen years of age or older at the time of the offense. The commission or attempted commission of aggravated murder and murder are category one offenses. R.C. 2151.26(A)(1)(a).
Defendant was charged with murder in violation of R.C.2903.02. She was also charged with involuntary manslaughter, a first degree felony, in violation of R.C. 2903.04. The trial court was mandated to relinquish jurisdiction of Defendant upon a finding that there was probable cause to believe that she had committed murder. Had the court determined that there was not probable cause to believe Defendant committed murder, however, bindover on the involuntary manslaughter charges would have been discretionary because Defendant neither (1) had a previous delinquency as a consequence of a category one or two offense, nor (2) was alleged to have used a firearm in the commission of the offense. R.C. 2151.26(B)(4) and (C)(1). See, generally, R.C.2151.26(A)(2)(b). In this event, the trial court would have been required, pursuant to R.C. 2151.26(C)(1)(c) and Juv.R. 30, to conduct an amenability hearing prior to transferring jurisdiction.
During a probable cause hearing, "[t]he juvenile court * * * does not find as a fact that the accused minor is guilty of the offense charged. It simply finds the existence of probable cause to so believe[.]" State v. Whiteside (1982), 6 Ohio App.3d 30,36. Probable cause is a flexible concept, grounded in probabilities, requiring more than a mere suspicion of guilt but a degree of proof less than that required to sustain a conviction. Brinegar v. UnitedStates (1949), 338 U.S. 160, 175, 93 L.Ed. 1879, 1890.
During the bindover hearing, a friend testified that she had spoken with Defendant on the morning preceding the birth, and that at that time Defendant had suspected that she might be in labor. Another friend recalled that Defendant told her that she had felt the baby move prior to the birth. Patrolman Davis recounted his discovery of the baby's body wrapped in a towel, placed in a garbage bag, and secured in a second garbage bag beneath a blanket. Dr. Christin Rolf, who performed the autopsy on the baby, testified that the baby's lungs revealed a degree of aeration consistent with a live birth and that air was detected in the stomach and small intestine. She stated that there was no indication of dehydration or injury to the baby. She concluded that the cause of death was asphyxia, based on her examination of the body and the circumstances surrounding the death:
 We found no other cause of death. There were no congenital malformations. There was no injury. It does not look like the baby was killed by inflicting wounds. With the situation, that's the only thing we can come up with.
Upon review of the autopsy report, Medina County Coroner Neil Grabenstetter ruled that the baby died as a result of homicide.
There was sufficient evidence before the juvenile court to support a determination that there was probable cause to believe that Defendant had committed murder. Because murder is a category one offense, bindover was mandatory under these circumstances, and the trial court was not required to conduct an amenability hearing.
Defendant has also argued that misconduct by the State resulted in a bindover hearing that violated her constitutional right to due process of law. Specifically, she has alleged that (1) the hearing was impermissibly tainted by the State's failure to produce potentially exculpatory evidence and (2) the State knowingly produced false testimony at the hearing.
Defendant's first argument is that the State failed to produce Exhibit 77 during discovery prior to the bindover hearing. She has maintained that had Exhibit 77 been introduced at the bindover hearing, the juvenile court at most could have concluded that there was probable cause to believe that she committed involuntary manslaughter. As a result, she has argued that the failure to produce Exhibit 77 wrongly subjected her to mandatory bindover and deprived her of her right to an amenability hearing prior to bindover and the potential of remaining within the jurisdiction of the juvenile court. These arguments are without merit.
On June 23, 1997, prior to the preliminary bindover hearing, Defendant made a request for discovery pursuant to Crim.R. 16. The State complied with the request by producing a list of witnesses and reports. Defendant has maintained that the failure to disclose Exhibit 77 at that time violated the State's obligations pursuant to Brady v. Maryland (1963), 373 U.S. 83,10 L.Ed.2d 215, and Crim.R. 16.[2]
Defendant requested discovery pursuant to Crim.R. 16. Discovery in juvenile proceedings, however, is governed by Juv.R. 24(A), which provides:
 Upon written request, each party of whom discovery is requested shall, to the extent not privileged, produce promptly for inspection, copying, or photographing the following information, documents, and material in that party's custody, control, or possession:
* * *
 Except in delinquency and unruly child proceedings, other evidence favorable to the requesting party and relevant to the subject matter involved in the pending action. In delinquency and unruly child proceedings, the prosecuting attorney shall disclose to respondent's counsel all evidence, known or that may become known to the prosecuting attorney, favorable to the respondent and material either to guilt or punishment.
Juv.R. 24(A)(6) would have been the appropriate means for Defendant to request discovery prior to the preliminary hearing in juvenile court. While the State must comply with a proper discovery request made under Juv.R. 24, the juvenile court retains the discretion to place limits or conditions on any request made by the juvenile. Juv.R. 24(B). In contrast with Crim.R. 16, for example, "the court may deny, in whole or in part, or otherwise limit or set conditions on the discovery authorized by [Juv.R. 24(A)] * * * [if] granting discovery may * * * impede the criminal prosecution of a minor as an adult[.]" Juv.R. 24(B).
It is unclear whether the requirements of Brady, as embodied in Crim.R. 16, apply with full force in bindover proceedings. Because waiver of juvenile court jurisdiction is "a `critically important' action determining vitally important statutory rights of the juvenile," Kent v. United States (1966), 383 U.S. 541,553-56, 16 L.Ed.2d 84, 93-94, bindover proceedings must reflect procedural regularity, sufficient under the circumstances, that satisfies the basic requirements of due process and fairness. Id.
at 553-56, 16 L.Ed.2d 84, 93-94. In Kent, the Court noted, nonetheless, that the hearing required by due process guarantees may be informal and need not conform with all elements required of a trial or even of an administrative hearing. Id. at 562,16 L.Ed.2d at 97-98. Simply, this hearing must comport with "the essentials of due process and fair treatment." Id. at 562,16 L.Ed.2d at 98.
Similarly, in In re Gault (1967), 387 U.S. 1, 18 L.Ed.2d 527, the Court concluded that a proceeding to determine the delinquent status of a child must afford the rights to notice of the charges, effective assistance of counsel, and confrontation of witnesses, and the privilege against self-incrimination. The Court emphasized that its decision was limited to the adjudicative phase of juvenile proceedings in which the child may be determined to be delinquent and committed to custody of the State. Id. at 13,18 L.Ed.2d at 538. The Court specifically excepted from its holding "the pre-judicial stages of the juvenile process." Id. The preliminary hearing in a bindover proceeding is not adjudicatory in nature. See, generally, State v. Whisenant (1998), 127 Ohio App.3d 75,83-85. By comparison, courts have concluded that the requirements of Brady do not apply to preliminary hearings in the criminal context when probable cause for bringing a charge is at issue. See United States v. Williams (1992), 504 U.S. 36, 51,118 L.Ed.2d 352, 368; State v. Ball (1991), 72 Ohio App.3d 549, 550.
Nevertheless, assuming that Crim.R. 16(B)(1)(f) applies with equal force in the preliminary bindover hearing, Defendant has not demonstrated prejudice. Potentially exculpatory evidence subject to disclosure under Crim.R. 16 is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Johnston (1988), 39 Ohio St.3d 48, paragraph five of the syllabus. See, also, State v. Keene,81 Ohio St.3d at 650 (concluding that the definition of materiality provided byBrady is also applicable to Crim.R. 16[B][1][f]). A reasonable probability consists of "a probability sufficient to undermine confidence in the outcome." State v. Johnston, 39 Ohio St.3d at paragraph five of the syllabus.
During the preliminary hearing, Dr. Rolf testified that a small piece of membrane recovered from the scene indicated inflammation around the placenta. She stated that this could signify that "[p]ossibly an infection could have occurred," but that she could not be certain. On cross-examination, the following exchange occurred:
 Q: Okay. You talk about chorionitis. Tell the Court what the chorion is?
* * *
 A: Chorion is one of layers [sic] of the placental membranes and it's, um — you have the fetal surface, and you have the inner surface, which is the chorion, which is up against the uterus.
 Q: Okay. Chorionitis, then, is an infection or an inflammation of the chorion?
 A: Inflammation does not mean infection. It does not mean — I'm sorry. It does not mean infection only, and it does not mean other causes, which could cause this.
Q: But it is abnormal; is it not?
A: Yes.
Testimony also indicated that Defendant's blood was Rh negative, but that tests had not been conducted to determine whether this factor could have caused complications with the baby's birth. After the State presented evidence, Defendant moved for a continuance to research this issue. The juvenile court denied the motion, stating that it did not "believe that such an argument would impact any finding of this Court with regard to the issue of probable cause[.]" The court emphasized that probable cause was the only issue under consideration at that time.
Although the blood culture in dispute was not before the juvenile court, Dr. Rolf was examined and cross-examined about the presence of a possible infection in utero. Defense counsel aggressively cross-examined both Dr. Rolf and Dr. Grabenstetter with respect to many other potential causes of the baby's death. The court found probable cause to believe that Defendant had committed a category one offense nonetheless. The evidence presented and the court's own statements indicate that disclosure of the blood cultures prior to the hearing would not have created a reasonable probability that the result of the proceedings would have been different.
Defendant has also argued that the State knowingly employed false testimony during the bindover hearing. A prosecutor may not knowingly present false testimony in order to procure a verdict.McMullen v. Maxwell (1965), 3 Ohio St.2d 160, 165. When the State obtains a conviction by the knowing use of false evidence, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment[.]" United States v. Agurs (1976), 427 U.S. 97, 103,49 L.Ed.2d 342, 349-50. See, also, State v. Vaughn (1995),106 Ohio App.3d 775, 786. This outcome, however, is limited to actual misconduct by the State in which the prosecutor knew the false nature of the testimony. See Napue v. Illinois (1959),360 U.S. 264, 269, 3 L.Ed.2d 1217, 1221. In this sense, such misconduct causes "a corruption of the truth-seeking function of the process." United States v. Agurs, 427 U.S. at 104,49 L.Ed.2d at 350. The result has been characterized as:
 [a conviction] contrived * * * through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.
Mooney v. Holohan (1935), 294 U.S. 103, 112, 79 L.Ed. 791, 794.
Defendant has directed our attention to the testimony of Dr. Grabenstetter during the bindover hearing conducted on June 27, 1997, with respect to whether blood cultures were performed on the baby:
 Q: Okay. Do you know whether any other blood tests, compatibility or, as I said, CBCs or differentials or anything, anything was done to determine the presence of disease in the infant?
A: Not other than what's reported in the autopsy protocol.
 Q: You do know, do you not, that there was evidence of chorionitis?
A: Yes.
 Q: Did anybody do any sampling of that tissue to determine what caused the inflammation?
 A: I'm not aware of that. That would have been done by the obstetrician.
* * *
 Q: Wouldn't you ordinarily want to have something like that cultured, so you could determine whether or not there was a disease that would have been fatal to this baby?
A: Generally, you would culture that.
Q: You didn't do that?
A: No.
* * *
 Q: * * * we don't know that there's [sic] blood cultures done[?]
* * *
 Q: We know that cultures of inflamed tissue wasn't [sic] done, so there's [sic] a lot of holes; aren't there?
A: Again, I don't know if that would make a difference.
Dr. Grabenstetter testified similarly on re-direct examination:
 Q: Is it accurate to say that you have to speculate to determine what caused that inflammation without more tissue?
 A: Well, again, that can be a cause for premature labor, for instance, and in that circumstance when the person is under medical care, usually cultures are done to determine the cause for it. Without cultures, then it's speculation.
Q: No cultures were done because there was no prenatal care?
A: As far as I know, no cultures were done.
Q: The cultures would have to be done before the delivery?
 A: Generally not before. They would be done in the delivery process.
During the hearing on the motion for a new trial, Medina County Prosecutor Dean Holman confirmed that he discovered the existence of Exhibit 77 during a visit to the Cuyahoga County Coroner's Office during November 1997. Prior to that time, he had obtained "the autopsy protocol, the autopsy report, toxicology attached, and * * * a report from the trace evidence lab." He stated that Assistant Prosecutors Mary Ann Kovach and Ann Eisenhower worked on this case during the juvenile proceedings and that they had access to the same documents. Ms. Kovach recalled:
 I remember we didn't get much of the paperwork until right before the hearing, I think the autopsy report I received a few days ahead of time, and I only received, I had less of an autopsy report going into the hearing than [defense counsel] did because I remember something that happened at the hearing, I had some photographs, I know I had showed them to him at least the day before, but I did not have the Coroner's photographs, I don't think, until the day of the hearing.
* * *
 When we got to the hearing, Dr. Rolf had the first four pages [of the autopsy report].
 When Dr. Grabenstetter testified, after Dr. Rolf testified, he had more pages, and I was surprised, and I turned to [defense counsel] and said, it looks like there is [sic] more pages here, and [defense counsel said] let me see, and he had his copy out, and he had the two pages of the toxicology report, which I did not have, did not know about, but Dr. Grabenstetter had.
Ms. Kovach stated that she also became aware of Exhibit 77 during November 1997. Assistant Cuyahoga County Coroner Robert Chellener testified that he would have received the culture results from the pathology laboratory at Case Western Reserve University sometime after May 8, 1997, but was unable to pinpoint the date with accuracy because the report was not stamped when filed.
The burden of demonstrating the use of false testimony lies with the defendant. See State v. Vaughn, 106 Ohio App.3d at 786. Despite Defendant's assertion that "it is not open to dispute that Dr. Grabenstetter testified falsely when he stated that no blood cultures were performed," she has not demonstrated that Dr. Grabenstetter, who received his information from the Cuyahoga County Coroner, was aware of the existence of Exhibit 77 prior to testifying in the bindover hearing. In addition, she has not demonstrated that the State was aware of Exhibit 77 at the time of the hearing. Accordingly, Defendant's argument that the State's knowing use of false testimony deprived her of her constitutional guarantee of due process of law during the bindover proceeding is without merit. Defendant's first assignment of error is overruled.
ASSIGNMENT OF ERROR II
 The trial court erred in denying Defendant's motion to suppress evidence where the warrantless search greatly exceeded the scope of the explicit consent, the silence held to constitute further consent took place while [Defendant] and her parents were being illegally detained, and [Defendant's] statements were the fruit of that illegal detention.
In her second assignment of error, Defendant has argued that the trial court incorrectly denied her motion to suppress all evidence gathered during the search of her parents' residence and all evidence obtained as fruit of that search. Specifically, she has argued that law enforcement officials illegally detained the Iacona family and that their consent to a search of the home was not voluntary. She has also argued that statements made by Defendant during the search should have been suppressed as the product of an illegal custodial interrogation. These arguments are without merit.
The warrantless entry and search of a residence is presumptively unreasonable under the Fourth Amendment. Payton v. New York (1980),445 U.S. 573, 586, 63 L.Ed.2d 639, 651. One established exception to the warrant requirement is a search conducted pursuant to consent.Schneckloth v. Bustamonte (1973), 412 U.S. 218, 219, 36 L.Ed.2d 854,858. In order to rely upon a purported consent to search, the State must demonstrate by clear and positive evidence that consent was freely and voluntarily given. State v. Posey (1988), 40 Ohio St.3d 420,427, certiorari denied (1989), 492 U.S. 907, 106 L.Ed.2d 567. "[W]hether a consent to search was in fact `voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."Schneckloth v. Bustamonte, 412 U.S. at 227, 36 L.Ed.2d at 862-63. Consequently, officers need not inform the subject of the right to refuse a search in order for consent to be deemed effective. SeeState v. Robinette (1996), 519 U.S. 33, ___, 136 L.Ed.2d 347,355.
"`When considering a motion to suppress, the trial court assumes the role of trier of fact and thus, stands in the best position to resolve issues of fact and witness credibility.'"State v. Cumberledge (Sept. 16, 1998), Lorain App. No. 97CA006959, unreported, at 5, quoting Cuyahoga Falls v. Stephenson
(June 18, 1997), Summit App. No. 18011, unreported, at 4. While we defer to the findings of the trial court on a motion to suppress provided that they are supported by competent, credible evidence, our review of the application of the law to the facts isde novo. State v. McNamara (1997), 124 Ohio App.3d 706, 710.
In the instant case, the trial court's findings were based on the testimony of Patrolman Patrick Domos and Defendant's parents, and on State's Exhibits 6 and 10. State's Exhibit 6 is a tape recording made by Patrolman Domos on the day of the search and State's Exhibit 10 is a transcription of that tape. Based on this evidence, the trial court found that Patrolman Domos arrived at the home of Defendant after he received a dispatch that there was a dead baby in the basement of the home. Upon arrival, the patrolman was greeted by Defendant's mother, who invited him into the home. The trial court found that this invitation constituted verbal consent to enter the home. Further, this consent was given by Defendant's mother after Patrolman Domos informed her of the dispatch he had received.
The trial court also found that Defendant's mother consented to a search of the premises. This consent was verbal in nature and was in response to a request by the officer, specifically:
Domos: You mind if I take a look down the basement?
Mrs. Iacona: No. I don't care.[3]
The trial court concluded "that a reasonable officer would interpret the statement and the environment surrounding the statement to mean that a full and consensual search was authorized." The court also concluded that Mrs. Iacona's consent:
 * * * was in no way limited to only Patrolman Domas [sic]. Patrolman Domas [sic] was acting in his capacity as an officer of law and therefore the consent proffered by Mrs. Iacona extended to all of the officers who would later arrive unless she at some time limited or revoked the consent.
The trial court concluded that Mr. and Mrs. Iacona did not withdraw their consent. Specifically, the court noted that the Iaconas expressed frustration, but reaffirmed their willingness to comply with the officer's efforts. This conclusion is supported by conversations that occurred between the Iaconas and Patrolman Domos:
 [Mr. Iacona]: If somebody makes an anonymous call * * * [t]hey don't go search somebody [sic] house based on an anonymous phone call.
* * *
[Domos]: Well I asked to come in I'm just not, you know —
 [Mr. Iacona]: Oh no, no I don't care about that, I'm just saying —
 [Mrs. Iacona]: I don't care about that either, it's just so absurd.
* * *
 [Mr. Iacona]: If somebody's house gets searched because of it, somebody's got to be responsible for making a phone call.
 [Domos]: Well that's true but you have to understand, somebody says something like that we have to * * * follow-up.
 [Mr. Iacona]: Oh I do. I have no problem with that. I'm just, I just want to find out who would make a charge like that because that's a serious charge.
* * *
 [Mrs. Iacona]: * * * oh I mean I understand about getting involved and all that kind of thing but —
* * *
 [Mr. Iacona]: I know everybody has a job to do and I'm always willing to comply. There's no problem with that[.]
The mere consent to the entry of a police officer into a residence does not constitute consent to search the premises.State v. Chapman (1994), 97 Ohio App.3d 687, 690, citing Lakewoodv. Smith (1965), 1 Ohio St.2d 128, 129-30. In Lakewood, the Court noted:
 [the officers' entrance] was acquiesced in only because the persons requesting entrance were police officers acting under color of office. The consent to entrance was granted in submission to authority rather than as an understanding and intentional waiver of the defendant's constitutional right to be free from unreasonable search and seizure.
 Id. at 130. In this case, however, Patrolman Domos informed the Iaconas after entering that his purpose was to investigate the presence of a dead child in the basement, and Mrs. Iacona explicitly granted consent to a search of the basement. The subject of a search may limit the scope of consent and may withdraw or limit the scope of consent after a search has begun.State v. Rojas (1993), 92 Ohio App.3d 336, 339. Neither Mr. nor Mrs. Iacona, by word or action, limited the scope of the consent granted to Patrolman Domos. Cf. State v. Robinson (1995),103 Ohio App.3d 490, 495 (observing that the defendant communicated limitations on the scope of his consent to a search of his apartment by closing the door and concluding that the officers exceeded the scope of that consent by thrusting the door open). Defendant's contention that consent to search the home was not voluntarily and knowingly given is without merit. In addition, both the finding of consent to search and consent to enter given by Defendant's mother is effective as to Defendant. "[A] parent who owns or controls the premises in which a child resides has the right to consent to a search thereof even though such search may produce incriminating evidence against the child." State v.Carder (1966), 9 Ohio St.2d 1, 10. For these reasons, Defendant's first argument is not well taken.
Defendant's second argument must fail alongside the first. She has maintained that the search of the home without valid consent rendered the search illegal and resulted in the illegal detention of the residents. She has reasoned that all of the statements that she made to the police during the search were therefore made in the course of a custodial interrogation that had been tainted by the illegal search. Because we have determined that the search of the Iacona residence was conducted pursuant to a valid consent, the taint alleged by Defendant is nonexistent. See State v. Lorraine (1993), 66 Ohio St.3d 414, 424, certiorari denied (1994), 510 U.S. 1054, 126 L.Ed.2d 679 (concluding that because the defendant's rights were not violated during a custodial interrogation, the written statement taken subsequently did not constitute "fruit of the poisonous tree"). Defendant's second assignment of error is overruled.
ASSIGNMENT OF ERROR III
 The court below erred in denying [Defendant's] motion for a new trial on the ground that the blood culture report had been "provided" to the defense. Even if provided before trial, the state presented the report in a manner calculated to obscure its significance, and perpetuated its concealment by false and misleading testimony at trial.
In her third assignment of error, Defendant has alleged that the trial court erred by denying her motion for a new trial based on the conclusion that she did not demonstrate that the State failed to produce Exhibit 77. In addition, Defendant has argued that even if Exhibit 77 was provided, (1) it was incumbent upon the State to demonstrate that the blood culture report had been provided to and received by the defense, and (2) after providing disclosure of the report, the State presented misleading testimony about the nature of toxicology tests performed on the baby.
Following the jury verdict, Defendant moved for a new trial pursuant to Crim.R. 33(A), which provides:
 A new trial may be granted on motion of the defendant for any of the following causes affecting materially [her] substantial rights:
 (1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
 (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;
* * *
 (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.
Although the face of Defendant's motion for a new trial stated that she was moving pursuant to subsections (1), (2), and (6), the substance of the motion, and the subsequent hearing, focused almost entirely on alleged misconduct by the State. The trial court denied the motion.
In reviewing a trial court's ruling on a motion for a new trial premised on prosecutorial misconduct, this court must employ a due process analysis. See State v. Johnston,39 Ohio St.3d at 59. Failure of the prosecution to disclose evidence favorable to the accused constitutes a denial of due process when such evidence is material to either guilt or punishment, without respect to whether the prosecution acted in bad faith. Id. at paragraph four of the syllabus.
In determining whether the alleged nondisclosure of the report "materially affected" Defendant's substantial rights, we are guided by the Supreme Court of Ohio:
 In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether evidence is specifically, generally or not at all requested by the defense.
 State v. Johnston, 39 Ohio St.3d at paragraph five of the syllabus. Accordingly, nondisclosure of the report at issue could only be sufficient grounds for a new trial if there is a reasonable probability that, had the report been disclosed to the defense, the result of the proceeding would have been different.
Logic precludes this court from reaching this conclusion. Defendant was convicted of: two counts of involuntary manslaughter, violations of R.C. 2903.04(A); one count of endangering children, a violation of R.C. 2919.22(A) and (E)(2)(c); one count of endangering children, a violation of R.C.2919.22(B)(1) and (E)(2)(c); and one count of abuse of a corpse, a violation of R.C. 2927.01(B). Most germane to the disposition of this appeal are the convictions for involuntary manslaughter and endangering children premised on R.C. 2903.04(A) and 2919.22(A) and (E)(2)(c). R.C. 2919.22(A) provides that "[n]o person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." The phrase "duty of care, protection, or support" embraces "those duties of a parent toward [a] child as are imposed by law." State v. Sammons
(1979), 58 Ohio St.2d 460, 463. "The norm in our society is for a parent to strive to see that his children are reasonably well nourished, housed, and clothed and reasonably protected from harm, and provided with necessary health care." Id. Consequently, when a legal duty toward a child exists and when a parent inexcusably fails to discharge that duty, the omission violates R.C.2919.22(A) if it results in a substantial risk to the child's health or safety. State v. Kamel (1984), 12 Ohio St.3d 306, paragraph one of the syllabus.
The underlying rationale behind this charge is that, because Defendant made no attempt whatsoever to secure any post-delivery care for her child — not even informing her own mother and father,[4] who were present in the house, that a baby had just been born in their basement — her child died. There is little authority from the courts of Ohio concerning the death of newborn children as a result of a mother's failure to meet her duty of care. See, e.g., State v. Hopfer (1996), 112 Ohio App.3d 521. There is, however, authority related to this issue from other jurisdictions that, while not binding on this court, may inform our discussion. See, e.g., Goldsmith v. State
(Ala.Crim.App. 1977), 344 So.2d 793, 798, certiorari denied (Ala. 1977), 344 So.2d 799 (explaining that "`it may be generally stated that for a parent, having special charge of an infant child, so culpably to neglect it that death ensues as a consequence of such neglect, is manslaughter if death or grievous bodily harm were not intended; and murder if there was an intent to inflict death or grievous bodily harm'"), quoting 1 Wharton's Criminal Law (12 Ed.), Section 485; People v. Chavez
(Cal.App. 1947), 176 P.2d 92, 96 (upholding manslaughter conviction of a mother who had concealed her pregnancy and the resulting birth from her family for her "complete failure * * * to use any of the care towards [her] infant which was necessary for its welfare and which was naturally required of her" when, "[w]ith plenty of assistance near at hand she intentionally chose not to call for any help").
If the child died after birth of the infection and not of asphyxia, as Defendant now claims, it could hardly be said based on the evidence presented to the trial court that the infection would have afforded Defendant a winning defense against the charges of which she was convicted. Defendant's defense at trial was that her baby was stillborn, which, if accepted as true by the jury, would have provided a defense not only to the murder charge but to the involuntary manslaughter and endangering children charges as well. While a defense that the infection caused the child to be stillborn would be relevant, Defendant failed to present any medical evidence at the motion for a new trial supporting such a theory. In fact, the evidence she did present indicated that her own experts believed that the child died after a live birth; while the experts attributed the cause of death to the infection, they failed to set forth a dispositive probability that Defendant could not have saved her child. As such, Defendant has failed to demonstrate that there is a reasonable probability that the possible existence of group A streptococcus would be dispositive of the involuntary manslaughter charge predicated upon her failure to fulfill her duty of care.
At the motion for a new trial, Dr. Richard Blinkhorn, Jr., an expert witness called on behalf of Defendant, testified as follows:
 [Answer by Dr. Blinkhorn]: Once an infant, at the time of delivery, is showing signs of fetal distress, that would be an emergency, the baby needs to be delivered immediately.
A team would immediately be called in. * * *
 As soon as the baby is born, if the baby has fetal distress, has neonatal asphyxia, that team of individuals would immediately take that baby and immediately begin resuscitation.
Q. What happens if that kind of response is not made?
A. Then the baby will die.
On cross-examination, the issue of how quickly an infected baby would perish was raised:
 Q. What you are saying is, as far as rapidness, in your direct testimony you said that this could rapidly cause death as early as six hours, is that correct?
A. Or less.
* * *
Six hours or less, what do you mean by less?
A. Less than six hours, that is what I mean.
* * *
 Q. Could someone die of Strep within a matter of minutes of being infected?
A. Yes.
Q. Have you ever treated anyone [where] that has occurred?
A. Yes.
 Q. Have you ever treated any newborns [where] that has occurred?
A. No.
Both Dr. Blinkhorn and forensic pathologist Dr. Robert Kirschnir testified that seventy-five to eighty-five percent of those infants who have neonatal asphyxia or neonatal sepsis and who receive treatment will survive. The odds of survival for a baby such as Defendant's child, who was born in an environment without such treatment, are substantially worse, however, as Dr. Kirschnir testified:
 Q. Doctor, in this case the State contended this was a healthy baby and would have survived if it had been kept warm and someone called 9-1-1, is that correct?
A. No, that is not correct.
Q. Tell us why?
A. Again, it was not a healthy baby.
 This was a child who was septic, it was born markedly prematurely, it needed immediate on-site medical attention.
 That is why when deliveries occur in hospitals, we have a neonatologist standing by, particularly in a case where the child is believed to be at risk, or is showing evidence of fetal distress, to provide immediate care because within minutes the child can die without care.
This testimony fails to create the reasonable probability necessary to warrant a new trial. In reaching this conclusion, we are persuaded by the rationale of Lucas v. State (July 9, 1999), Ala.Crim.App. No. CR-97-1419, unreported, 1999 Ala. Crim. App. LEXIS 190, wherein an Alabama court of appeals, addressing a murder case involving a mother's failure to fulfill a parental duty to her child, stated:
 The State was not required to prove * * * that the victim would have "survived" if the appellant had obtained medical care sooner. Whether the victim would have lived or died after receiving "life-saving" and "necessary" medical care would in no way alter the appellant's parental duty to provide that care. To require the State to prove, as an element of the offense, that the victim would have survived if medical treatment had been made available to him would require the proof of an uncertainty.
Id. at *17. The mere possibility of the child having died within minutes of birth does not amount to a reasonable probability that, had such testimony been presented at trial, the outcome of the proceedings would have been different.
"[T]he key issue in a case where exculpatory evidence is alleged to have been withheld is whether the evidence is material," State v. Johnston, 39 Ohio St.3d at 60, and not whether evidence was simply withheld, whether through accident or deliberate conduct. It is therefore beyond question that the lack of materiality of the Exhibit 77 toward those crimes of which Defendant was actually convicted precludes us from finding that a new trial was warranted. The standard employed in such decisions is whether there is a reasonable probability — not the merepossibility — that, had the report been disclosed to the defense, the result of the proceeding would have been different. Because Defendant failed to establish a reasonable probability that sufficiently undermined confidence in the outcome of the proceedings, it cannot be said that she demonstrated the materiality of the report to the charges of which she was convicted. To grant a new trial based upon the evidence placed before the trial court would be to engage in speculation based upon controverted testimony. This is simply unwarranted.
Defendant has also argued that her right to due process of law was violated by the State's failure to ensure that the toxicology report was actually received by the defense in a manner calculated to put her on notice as to its potential significance. By this argument, Defendant attempts to expand the scope ofBrady's production demands to require actual receipt of exculpatory material by a defendant and affirmative steps by the State to ensure that the defendant appreciates the significance of the disclosed material. We decline to extend Brady to this degree.
Although Brady does impose a broad duty of disclosure on the State in a criminal case, courts have shown reluctance to expand its contours. With respect to the second component of Defendant's argument, the State is not required to disclose the exculpatory significance of information provided pursuant to Brady and Crim.R. 16. See State v. Parker (1990), 53 Ohio St.3d 82, paragraph one of the syllabus. "The government's duty to be forthcoming with favorable evidence does not compel it to draw and disclose inferences from the evidence which defense counsel is equally able to draw." State v. Hughes (Nov. 4, 1993), Cuyahoga App. No. 62884, unreported, 1993 Ohio App. LEXIS 5277, at *22 fn. 3.
The additional authorities cited by Defendant are also inapposite with respect to this theory. One court has noted that defense counsel's knowledge of the substance of exculpatory evidence may be effectively nullified when the State misrepresents its exculpatory quality. Hughes v. Hopper (C.A.5, 1980),629 F.2d 1036, 1039, certiorari denied (1981), 450 U.S. 932,67 L.Ed.2d 367, citing Freeman v. Georgia (C.A.5, 1979), 599 F.2d 65.[5]
This does not impose an affirmative requirement on the State to disclose the strategic significance of potentially exculpatory evidence once access to the evidence itself has been provided. Rather, it requires that once representations with respect to the usefulness of such evidence have been made, those representations cannot be false or misleading.
Defendant has advanced the proposition that Brady imposes a dual requirement of disclosure on the State: first, to provide access to potentially exculpatory material and second, to take active measures to ensure that the attempts to provide this access meet with success. Defendant directs our attention to In re Brown
(1998), 17 Cal.4th 873 for the proposition that "a document sent but not received is as useless as a document not sent at all."Id. at 881. The facts of Brown are distinguishable from this case.
In Brown, a crime lab failed to provide the State with a copy of an analysis worksheet that proved to be potentially exculpatory. The lab itself maintained that an attempt was made to transmit the worksheet to the defense, but at no time did the prosecution conduct a search of the crime lab's files to determine whether exculpatory evidence existed. Thus, in that case, the prosecution itself made no actual attempt to identify, evaluate, or provide exculpatory material. Given this threefold failure, the California Supreme Court concluded that the lab's own attempt at transmittal did not absolve the State's Brady responsibility.Id.
Defendant's second argument is that she was denied a fair trial by the State's knowing use of testimony that ignored the existence of Exhibit 77 and stated that there was no evidence of infection present in the baby's system. Pursuant to Crim.R. 33(A)(2), a new trial may be granted upon a demonstration of prosecutorial misconduct that materially affected the substantial rights of a defendant. This determination is not based on an examination of the instances of alleged misconduct in isolation, but in the context of the entire trial. State v. Keenan (1993),66 Ohio St.3d 402, 410.
"Where either [the government solicits false or misleading testimony or fails to correct it], the falsehood is deemed to be material [and thus, to warrant a new trial,] `if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" (Alterations in original.) UnitedStates v. Noriega (C.A.11, 1997), 117 F.3d 1206, 1221, quotingUnited States v. Alzate (C.A.11, 1995), 47 F.3d 1103, 1110. See, also, U.S. v. Agurs, 427 U.S. at 103, 49 L.Ed.2d at 350; State v.Vaughn, 106 Ohio App.3d at 786. Absent a finding that false or misleading testimony would create a reasonable likelihood of a different outcome a new trial is unwarranted. Giglio v. UnitedStates (1972), 405 U.S. 150, 154, 31 L.Ed.2d 104, 108.
Assuming for the sake of argument that the State did advance misleading testimony, Defendant cannot establish the requisite level of prejudice, as noted above. Defendant was not convicted of murder, and we are unable to conclude that in the context of the entire trial, a different outcome with respect to her conviction for involuntary manslaughter was a reasonable likelihood. Defendant's third assignment of error is overruled.
ASSIGNMENT OF ERROR IV
 The trial court erred in denying [Defendant's] motion for a mistrial, where it is undisputed that the state failed to disclose prior to trial, as required by Crim.R. 16(B)(1)(d), its expert's opinion that the positive blood culture result was due to contamination.
In her fourth assignment of error, Defendant has argued that the trial court incorrectly denied her request for a mistrial based on the State's failure to disclose the expert opinion of Dr. Challener as required by Crim.R. 16. Specifically, Defendant has contended that the State had a responsibility prior to trial to disclose the substance of conversations between Dr. Challener and the prosecuting attorney in which Dr. Challener expressed the opinion that Exhibit 77 was tainted by contamination that rendered the results insignificant.
Pursuant to Crim.R. 16(B)(1)(d), the State must permit:
 the defendant to inspect and copy or photograph any results or reports of * * * scientific tests or experiments, made in connection with the particular case, or copies thereof, available to or within in the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney.
The crux of Defendant's argument with respect to this assignment of error appears to be the assertion that statements made by Dr. Challener in conversations with the prosecuting attorney constitute "reports of * * * scientific tests or experiments" as contemplated by this rule.
While Crim.R. 16(B)(1)(d) undoubtedly requires the State to disclose existing "reports of * * * scientific tests or experiments," the rule does not compel the State to generate reports that are not already in existence for the benefit of a defendant. See, e.g., State v. Daws (1994), 104 Ohio App.3d 448,472 (holding that the State is not required to prepare a report detailing mental examinations conducted by psychologists retained by the prosecuting attorney). Consequently, the State's responsibility for disclosure is fulfilled when all existing documents connected with a scientific evaluation are provided to the defense. See id. at 473. The burden of disclosure does not extend to material upon which a report is based. State v.Robertson (May 26, 1994), Knox App. No. 92-CA-21, unreported, 1994 Ohio App. LEXIS 2422, at *6-7. Expert testimony that is not contained in any existing report does not fall within the scope of Crim.R. 16(B)(1)(d). See State v. Blankenship (Dec. 9, 1998), Summit App. No. 18871, unreported, at 15. See, also, State v.Crowe (July 22, 1992), Lorain App. No. 91CA005239, unreported, at 5 (concluding that a trial court did not abuse its discretion by declining to impose Crim.R. 16 sanctions in the absence of written test results).
Similarly, "Crim.R. 16(B)(1)(e) requires the disclosure of potential witness names, not the substance of their testimony."State v. Volgares (May 17, 1999), Lawrence App. No. 98CA6, unreported, 1999 Ohio App. LEXIS 2356 at *55. The mere fact that Defendant was unaware of Dr. Challener's opinion with respect to the significance of Exhibit 77 would not, in and of itself, provide grounds for excluding his testimony. See State v. Goble
(1982), 5 Ohio App.3d 197, 198.
The oral opinion of Dr. Challener with respect to the insignificance of the blood culture result and his subsequent testimony to that effect are not reports relating to scientific tests or experiments. As such, they do not fall within the disclosure requirement of Crim.R. 16(B)(1)(d). Defendant's fourth assignment of error is overruled.
ASSIGNMENT OF ERROR V
 The trial court committed prejudicial error by coercing [Defendant] into foregoing a natural cause of death defense, by threatening to allow the state to introduce highly prejudicial evidence that had previously been ruled inadmissible under Ev.R. 403 [sic].
In her fifth assignment of error, Defendant has argued that the trial court erred by advising her that previously excluded evidence would be admitted in the event that the defense chose to introduce evidence of a possible strep infection. We disagree.
On January 26, 1998, the State moved in limine for a determination of the admissibility of evidence pursuant to Evid.R. 404(B) and 403(A), including:
 [Defendant's] statements to others during pregnancy concerning how she did not want the child and was going to get rid of it; her smoking and substance use during pregnancy; her tanning in a tanning salon bed during pregnancy; her failure to seek prenatal care during pregnancy; and her prior pregnancy.
The State argued that this evidence was probative with respect to Defendant's mental state, motive, opportunity, plan, identity, and absence of mistake in the events leading up to the death of her baby. Defendant responded in opposition. Immediately prior to trial, the trial court concluded that Defendant's prior abortion and her sexual history were irrelevant. The court also concluded that evidence with respect to Defendant's drug use and failure to provide prenatal care, while relevant, should be excluded based on their potentially prejudicial impact. The court allowed evidence describing Defendant's statements during the pregnancy and testimony with respect to her prior pregnancy. At that time, the court noted that the rulings with respect to Defendant's drug use could be revisited during trial:
 [T]hese rulings are based upon what I know about everybody's case, from what they tell me in their memorandums, and I suppose there could be evidence, that I could envision situations [in] which there could be evidence that might make some of these things more relevant than they are, that would make them more probative than prejudicial.
 Whether or not that happens during the trial depends on the evidence.
 The other thing I would note is the motion in limine only goes to the State's case, it does not go to the rebuttal case, depending on what happens during your case, assuming the evidence the Court now considers more prejudicial might be more probative than prejudicial.
Defendant recalled Dr. William Meadow to the stand following the State's attempt to impeach his testimony using Exhibit 77 and immediately after Dr. Challener's testimony on recall. At that time, the court inquired with regard to the inferences underlying Dr. Meadow's conclusion that the results depicted in Exhibit 77 were not the result of contamination. Dr. Meadow stated that one link in his chain of inferences was that fact that the baby was born "somewhat pre-term." The court then asked Dr. Meadow whether cocaine use in the thirty days immediately preceding delivery could also have resulted in premature birth. Dr. Meadow acknowledged that possibility. At that time, the court conducted a discussion with counsel off the record. Dr. Meadow finished testifying at the conclusion of the sidebar, and the court instructed the jury to disregard any reference to "sepsic shock" in Dr. Meadow's testimony. At the close of the trial, Defendant moved to admit Exhibit 77 over the State's objection. The trial court excluded the exhibit. Our review of alleged errors is limited to the record on appeal pursuant to App.R. 9:
 An appellant has the responsibility of providing the reviewing court with a record of the facts, testimony, and evidentiary matters which are necessary to support the appellant's assignments of error. In the absence of a complete record, an appellate court must presume regularity in the trial court's proceedings.
(Citations omitted). State v. Tillman (1997), 119 Ohio App.3d 449,454. The record of Defendant's trial makes no reference to a "threat" by the trial court that its ruling with respect to Defendant's drug use would be revisited if she developed the potential implications of Exhibit 77. In addition, there is no indication that Defendant attempted to have the court's discussions with counsel placed on the record. Although Defendant's trial counsel testified as to the subject of the alleged coercion during the hearing on the motion for a new trial, and the judgment on the motion appears to assume the factual accuracy of counsel's assertion, this is insufficient to demonstrate the presence of error in the trial itself.
In order to demand reversal based upon this alleged error, Defendant must demonstrate that she requested that the court's comments be placed on the record. See State v. Palmer (1997),80 Ohio St.3d 543, 554, certiorari denied (1998), ___ U.S. ___,142 L.Ed.2d 76. Had such a request been made in the trial court, the appropriate procedure for Defendant to have followed on appeal is outlined in App.R. 9(C):[6]
 If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee no later than twenty days prior to the time for transmission of the record pursuant to App.R. 10, who may serve objections or propose amendments to the statement within ten days after service. The statement and any objections or proposed amendments shall be forthwith submitted to the trial court for settlement and approval. The trial court shall act prior to the time for transmission of the record pursuant to App.R. 10, and, as settled and approved, the statement shall be included by the clerk of the trial court in the record on appeal.
Defendant has also purported to assign error to alleged statements by the trial court that did not culminate in an evidentiary ruling. In effect, she invites this court to impute error to the motives and deliberations of the trial court. We cannot do so.
The deficiencies in the record notwithstanding, however, a review of the existing record reveals no abuse of the trial court's discretion. A trial court's ruling on a motion in limine
reflects a tentative resolution of an issue in anticipation of trial. State v. French (1995), 72 Ohio St.3d 446, 450. A motionin limine serves as:
 "a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury." The power to grant the motion * * * lies within the inherent power and discretion of a trial court to control its proceedings. The function of the motion as a precautionary instruction is to avoid error, prejudice, and possibly a mistrial by prohibiting opposing counsel from raising or making reference to an evidentiary issue until the trial court is better able to rule upon its admissibility outside the presence of a jury once the trial has commenced.
(Citations omitted). State v. Grubb (1986), 28 Ohio St.3d 199,201, quoting State v. Spahr (1976), 47 Ohio App.2d 221. The trial court retains the discretion to revisit a preliminary ruling on a motion in limine. See State v. French, 72 Ohio St.3d at 450. Similarly, determinations of admissibility pursuant to Evid.R. 403(A) are directed to the broad discretion of the trial court.State v. Allen (1995), 73 Ohio St.3d 626, 633, certiorari denied (1996), 576 U.S. 1178, 134 L.Ed.2d 222.
The trial court's initial determination in this case was that evidence of Defendant's drug use, although otherwise admissible, could result in prejudice substantially outweighing its probative value. See Evid.R. 403(A). The record contains the following exchange between the trial court and Dr. Meadow, testifying on recall:
 The Court: Let me ask you this, Doctor. Doctor, do you know, if you look at a blood culture, is it possible that strep, that Group A strep, is it possible that [it] can come from places other than a blood sample to show up?
Dr. Meadow: Could it be a contaminate, it is possible.
The Court: You don't know if it is, or possible?
Dr. Meadow: I think we can draw —
The Court: Just answer my question.
 Dr. Meadow: I understand. I can't be positive. I can make some inferences to likelihood.
* * *
[The jury was excused.]
The Court: What are those inferences?
 Dr. Meadow: What you have got here, you have a baby who was born moribund, somewhat pre-term, and the question that was in my, what I wrote in my statement, the cause of death is the same thing that caused the baby to be moribund.
 Now, all of a sudden, I see a blood culture from the baby that is associated with sepsic shock, and so now I have a baby, the most common cause is unknown, but the most recognized is infection.
 The Court: Let me ask you this, isn't premature birth also caused by use of cocaine?
Dr. Meadow: Not nearly as high. Most people would say no.
* * *
 The Court: * * * Could a baby be delivered premature if a mother used cocaine in the last thirty days?
Dr. Meadow: The answer is, it is possible.
The Court: And —
Dr. Meadow: Not as likely as infection.
The Court: Okay, but is it possible?
Dr. Meadow: Yes.
The trial court specifically noted that evidence of Defendant's drug use in the weeks preceding delivery could become more probative in light of the evidence presented during the trial. There is no indication that the trial court acted in a manner characterized by perversity of will, passion, prejudice, partiality or moral delinquency. See State v. Green (1996),116 Ohio App.3d 56, 59. Defendant's fifth assignment of error is overruled.
ASSIGNMENT OF ERROR VI
 If the court should find that the blood culture report was produced by the state in a recognizable form, [Defendant] was denied her right to effective assistance of counsel by her attorneys' failure to present the defenses it disclosed.
In her sixth assignment of error, Defendant has argued that she was denied effective representation by her trial counsel's failure to pursue a defense based upon the contents of Exhibit 77 prior to its introduction by the State. We disagree.
Appeals based on ineffective assistance of counsel are governed by a standard of objective reasonableness. Strickland v.Washington (1984), 466 U.S. 668, 688, 80 L.Ed.2d 674, 693; Statev. Bradley (1989), 42 Ohio St.3d 136, 142. Under this standard, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment," and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" Strickland v. Washington,466 U.S. at 687, 80 L.Ed.2d at 693. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different. Id. at 694, 80 L.Ed.2d at 698. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689, 80 L.Ed.2d at 694.
"Judicial scrutiny of counsel's performance must be highly deferential." State v. Bird (1998), 81 Ohio St.3d 582, 585, citing Strickland v. Washington, 466 U.S. at 689,80 L.Ed.2d at 694. This court will not second-guess strategic decisions made by trial counsel. See State v. Mason (1998), 82 Ohio St.3d 144, 161, certiorari denied (1998), ___ U.S. ___, 142 L.Ed.2d 562. See, also, Strickland v. Washington, 466 U.S. at 690,80 L.Ed.2d at 695. Selection of which defense to pursue in light of the circumstances surrounding an individual case is one area within the purview of counsel's strategic judgment. See State v.Phillips (1995), 74 Ohio St.3d 72, 85, certiorari denied (1996),517 U.S. 1213, 134 L.Ed.2d 938 (observing that the defendant's assertion that trial counsel should have pursued an alternate defense was unfounded given the strategic nature of that choice);State v. Decker (1986), 28 Ohio St.3d 137, 140-41 (concluding that the decision not to pursue an insanity defense was a reasoned, strategic choice). The fact that the trial strategy selected proved to be unsuccessful does not equate per se to a denial of effective assistance of counsel. See State v. Frazier (1991),61 Ohio St.3d 247, 255, certiorari denied (1992), 503 U.S. 941,117 L.Ed.2d 629.
Counsel consistently attempted to portray Defendant as a teenager who was not actually certain that she was pregnant until labor progressed. Throughout the trial, counsel posited the defense on stillbirth. In furtherance of this theory, counsel inquired of the State's witnesses with respect to whether they had actual evidence of a live birth and vigorously attacked the inferences that led the State's witnesses to that conclusion. Counsel presented numerous witnesses challenging the conclusion that the baby was born alive, including projections of the baby's APGAR score within moments of birth and testimony of a physician who examined Defendant after the birth, who recounted Defendant's statement that the baby appeared blue-black in color. Counsel specifically attacked those witnesses for the State who testified that the amount of air in the baby's intestines could only have resulted from breaths taken over a period of time after delivery. Counsel aggressively cross-examined witnesses from whom the State had elicited testimony recalling comments made by Defendant about her pregnancy.
We are unable to discern any deficiency in counsel's election to prefer a stillbirth defense to a defense premised on a natural cause of death.[7] Indeed, the strategy pursued by counsel resulted in a jury that was unable to reach a verdict on the murder charge. Defendant's sixth assignment of error is overruled.
ASSIGNMENT OF ERROR VII
 [Defendant's] sentence is contrary to law because (1) involuntary manslaughter and child endangering are allied offenses of similar import so that [Defendant] could not be sentenced for both, and (2) absent specified findings which the trial court did not make, R.C. 2929.14(B) required that she be sentenced to the minimum term of incarceration as a first offender.
In her final assignment of error, Defendant has argued that the sentence imposed upon her by the trial court is unlawful. Specifically, she has maintained that the trial court placed her in double jeopardy by failing to merge her convictions for the purpose of sentencing and improperly sentenced her to prison terms in excess of the statutory minimum. We agree in part.
Defendant's first argument is that the trial court erred by failing to merge her convictions for child endangering and involuntary manslaughter for the purposes of sentencing. Defendant did not raise the issue of merger before the trial court. As such, this court will only recognize her later objections to the extent that the trial court's action constituted plain error. State v. Campbell (1994), 69 Ohio St.3d 38, 40-41, certiorari denied (1994), 513 U.S. 913, 130 L.Ed.2d 204; Crim.R. 52(B). This court has concluded that plain error does not exist when concurrent sentences are imposed for crimes that constitute allied offenses of similar import. State v. Martin (Feb. 9, 1999), Summit App. No. 18715, unreported, at 5. Nonetheless, we observe that the trial court in this case did not err by sentencing Defendant for involuntary manslaughter and the predicate offenses of endangering children.[8]
R.C. 2941.25(A) provides:
 Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
The determination of whether two offenses are of similar import is limited to an objective analysis of the statutory provisions at issue to determine whether the elements of the charged offenses "correspond to such a degree that the commission of one crime will result in the commission of the other." State v. Blankenship
(1988), 38 Ohio St.3d 116, 117. This statutory analysis is performed in the abstract, focusing solely on the elements of the offenses charged without reference to the facts of the particular case. State v. Rance (1999), 85 Ohio St.3d 632, paragraph one of the syllabus.
If the elements of the statutes do not correspond to this degree, "the offenses are of dissimilar import and the court's inquiry ends — the multiple convictions are permitted." Id. at 636. If the court determines that two offenses are allied offenses of similar import, it must proceed to examine the facts of the case to determine whether the crimes were committed separately or with a separate animus. State v. Blankenship,38 Ohio St.3d at 117. If offenses of similar import are committed separately or with a separate animus, a defendant may be punished for both. State v. Rance, 85 Ohio St.3d at 636; R.C. 2941.25(B).
R.C. 2903.04(A) prohibits actions that cause the death of another as the proximate result of committing or attempting to commit a felony. Pursuant to R.C. 2919.22(A):
 No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.
R.C. 2919.22(B)(1) prohibits abuse of a child under eighteen years of age. Endangering children is a felony of the third degree when it results in serious physical harm to the child. R.C.2919.22(E)(2)(c).
Comparing the elements of endangering children and those of involuntary manslaughter in the abstract, it is apparent that these offenses are not allied within the meaning of R.C.2945.25(A). Involuntary manslaughter requires the death of a victim in the course of committing or attempting to commit a felony. Felony endangering children, pursuant to R.C. 2919.22(A) and (E)(2)(c), requires neglect of a duty of care that results in serious physical harm to a child under eighteen years of age. R.C. 2919.22(B)(1) and (E)(2)(c) prohibit abuse of a child under eighteen years of age that results in serious physical harm. Neither offense requires proof of the death of the victim. Similarly, involuntary manslaughter does not require either violation of a duty of care or abuse of a child because endangering children is but one of many felonies upon which a charge of involuntary manslaughter may be predicated. See Statev. Rance, 85 Ohio St.3d at 639. Each offense, therefore, requires proof of an element that is not required by the other.
This analysis leads to the conclusion that felony endangering children and involuntary manslaughter are not allied offenses "because the commission of one will not automatically result in commission of the other[s]." Id. See, also, State v. Buckta
(Nov. 12, 1996), Pickaway App. No. 96 CA 3, unreported, 1996 Ohio App. LEXIS 5180, at *6-9.[9] Because it is apparent from the language of the statutory provisions that Defendant was not convicted of allied offenses, it is neither necessary nor appropriate to examine the particular facts underlying this case. See State v. Rance, 85 Ohio St.3d at 638-39. Defendant's convictions were authorized by R.C. 2941.25(A), and her first argument is without merit.
Defendant's second contention is that the trial court improperly sentenced her to a prison term in excess of the statutory minimum without making the required findings on the record. We agree.
R.C. 2929.14(B) provides:
 if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender and if the offender previously has not served a prison term, the court shall impose the shortest prison term authorized for the offenses * * * unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.
(Emphasis added.) This provision expresses a preference for the imposition of minimum sentences upon felony offenders who have not previously served a prison term. State v. Edmonson (1999),86 Ohio St.3d 324, 325. In construing this provision, the Supreme Court of Ohio has recently concluded that:
 unless a court imposes the shortest term authorized on a felony offender who has never served a prison term, the record of the sentencing hearing must reflect that the court found that either or both of the two statutorily sanctioned reasons for exceeding the minimum term warranted the longer sentence.
 * * * [T]he verb "finds" as used in this statute means that the court must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons.
* * *
 * * * [The court] must specify on the record that one or both reasons allowed by R.C. 2929.14(B) justify a sentence longer than the minimum[.]
Id. at 326-27.
Involuntary manslaughter in violation of R.C. 2903.04(A) is a felony of the first degree. See R.C. 2903.04(C). An offender may be sentenced to a prison term of three to ten years, inclusive, for a felony of the first degree. R.C. 2929.14(A)(1). Endangering children in violation of either R.C. 2919.22(A) or (B)(1) is a felony of the third degree if the offense results in serious physical harm to the victim. R.C. 2919.22(E)(2)(c). For a felony of the third degree, an offender may be sentenced to a prison term of one to five years, inclusive. R.C. 2929.14(A)(3).
Defendant was sentenced to concurrent prison terms of eight years on each count of involuntary manslaughter and to concurrent terms of three years on each count of endangering children. The trial court did not specify in its order that either consideration contained in R.C. 2929.14(B) contributed to the determination of the length of the prison sentences. In addition, the record contains only the following:
 This Court has reasoned for sometime [sic] wondering what it would do, has thought about this for sometime [sic] wondering what it would do if there was a guilty verdict in this case.
 The Court feels that the recommendation of the Prosecutor is not excessive, for this reason: [Defendant] was sixteen years of age when she became pregnant, and an eight year sentence would be one-half of your lifetime up to her pregnancy, and that may very well seem excessive to her family, but when you balance that against the fact that this baby is not alive because of [Defendant's] acts, there are thousands of couples in this state, and thousands of couples in this country who would have adopted that child, and would have felt proud and privileged to do so.
This child did not have to be in the situation where it is.
* * *
 Therefore, on the involuntary manslaughter, violation of duty of care, impose an eight year sentence of imprisonment at Marysville, also abuse of a child, to run concurrent.
 On child endangering, violation of duty and care, and abuse of a child, the Court would impose a three year sentence, all to run concurrent.
The record of sentencing in this case does not confirm that the trial court considered whether the minimum statutory prison term would demean the seriousness of Defendant's conduct or inadequately protect the public from future crime. See R.C.2929.14(B). See, also, State v. Eden (Nov. 17, 1999), Lorain App. No. 97CA00699, unreported, at 8-11. Consequently, Defendant's second argument is well taken, and her final assignment of error is sustained in part.
Defendant's first, second, third, fourth, fifth, and sixth assignments of error are overruled. Defendant's seventh assignment of error is overruled in part and sustained in part. The judgment of the trial court is affirmed in part and reversed in part, and this case is remanded to the trial court for sentencing proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and causeremanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to both parties equally.
Exceptions.
 _______________________________ LYNN C. SLABY
FOR THE COURT BAIRD, P.J., CARR, J. CONCUR.
[1] Juv.R. 30 was amended effective July 1, 1997. Because the criminal acts in this case were committed prior to the effective date of the amendments, all references to Juv.R. 30 shall be understood to refer to the version in effect at the time of the offense.
[2] In Brady, the United States Supreme Court concluded that "the suppression by the prosecution of evidence favorable to an accused * * * violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. at 87,10 L.Ed.2d at 218. Compliance with the discovery requirements of Crim.R. 16(B)(1)(f) fulfills the due process obligations imposed by Brady and its progeny. See State v. Hesson (1996), 110 Ohio App.3d 845,851. See, also, State v. Keene (1998), 81 Ohio St.3d 646,650.
[3] In its journal entry, the trial court noted that at the hearing Mrs. Iacona testified that she at first said "No," followed by a pause, then said "I don't care" because the officer did not stop going toward the basement door. The trial court concluded that this testimony was not credible. The determination of the credibility of witnesses on a motion to suppress is primarily for the trier of fact. State v. Smith (1997), 80 Ohio St.3d 89,105. As such, we defer to the trial court's determination with respect to this testimony.
[4] Defendant's mother had previously been trained as a registered nurse.
[5] In Freeman, a prosecution witness with potentially exculpatory testimony did not appear to testify at trial. The State maintained that her whereabouts were unknown; in fact, she had become romantically involved with the investigating police officer, who concealed her location. The court noted that the officer's knowing concealment was imputed to the State and that the defendant had premised his trial strategy on the expected cross-examination of the witness. In turn, the decision not to call the witness to testify for the defense was based on information contained in a police report that omitted the substance of the exculpatory portion of the witness's statement. The court concluded that based on this misrepresentation, the defendant's failure to call the witness on his own did not constitute waiver of his constitutional claim for the purposes of relief via a petition for habeas corpus. Id. at 72.
[6] See State v. Brewer (1990), 48 Ohio St.3d 50, 61, certiorari denied (1990), 498 U.S. 881, 112 L.Ed.2d 177. A supplement to the record consisting of stipulations of fact, settled and approved by the trial court, may also have been appropriate. See App.R. 9(E). See, generally, State v. Nobles
(1995), 106 Ohio App.3d 246, 269.
[7] We note that counsel's selection of a defense is especially significant given that Defendant was charged with involuntary manslaughter predicated on endangering children by failing to fulfill a parental duty of care. See our discussion of assignment of error three, supra.
[8] Defendant was convicted of two counts of endangering children in violation of two distinct provisions of R.C. 2919.22. She was also convicted on two charges of involuntary manslaughter, a violation of R.C. 2903.04. One charge of involuntary manslaughter was predicated on each count of endangering children. The court sentenced Defendant to concurrent prison terms for each count of involuntary manslaughter and each count of endangering children.
[9] But, see, State v. Brown (1982), 7 Ohio App.3d 113, 116-17. In Brown, the Tenth District Court of Appeals determined that endangering children and involuntary manslaughter were allied offenses of similar import. In so holding, however, the court examined the elements of the offenses with respect to the facts of the case at issue:
 If the defendant's conduct constituted two allied offenses of similar import, then defendant could be convicted of only one of the crimes unless it is determined that defendant's conduct resulted in two offenses of the same or similar kind committed separately or with a separate animus as to each. If they were so committed, then they cannot be allied offenses and defendant may be convicted of both.
 * * * Accordingly, in order for there to be allied offenses of similar import, under the circumstances of this case, we must determine that: (1) the state relies upon the same conduct to support both offenses; (2) that the offenses and their elements correspond to such a degree that commission of one of the offenses (here, the graver offense of involuntary manslaughter) will result in the commission of the other (here, the lesser offense of endangering children); and (3) that the commission of both offenses was motivated by the same purpose.
 Here, there can be no doubt that the state relied upon the same conduct as the basis for both offenses, a point conceded by the state in its brief. Similarly, there is no evidence that defendant was motivated by more than one purpose. And, in order to prove the defendant guilty of the greater offense of involuntary manslaughter, the state was required to prove the elements of the specified underlying felony of endangering children. Clearly, the same conduct of the defendant can be construed to constitute two allied offenses of similar import.
(Citations omitted and emphasis added). Id. This court has reached the same conclusion in the past. See State v. Beinlein
(Sept. 2, 1987), Medina App. No. 1546, unreported, at 4 (concluding that involuntary manslaughter and endangering children were allied offenses of similar import based on the fact that, in that case, the State was required to prove the elements of endangering children as the predicate offense to involuntary manslaughter). But, see, State v. Jennings (July 12, 1989), Summit App. No. 13912, unreported, at 15 (stating that "the record contains sufficient evidence for the trial court to find, underthese facts, that child endangering and involuntary manslaughter are not allied offenses of similar import[.]" (Emphasis added.)) Noting that this fact-specific analysis has led to inconsistent results in the appellate courts, the Supreme Court of Ohio has clarified that comparison of the elements of multiple offenses under R.C. 2941.25 should take place without reference to the facts of the individual case. State v. Rance, 85 Ohio St.3d at paragraph one of the syllabus and at 637-38. For this reason, those cases utilizing a fact-specific analysis were implicitly overruled by Rance. See id. at 638.